ALLIE M. MARSH *v.* LOUIS N. WHITTINGTON.

MARRIAGE. *Duress. Equity. Annullment.*

> A court of equity will annul a marriage if it were procured by duress and not subsequently ratified.

FROM the chancery court of Adams county.

HON. WILLIAM P. S. VENTRESS, Chancellor.

Whittington, the appellee, was complainant in the court below; Miss Marsh, the appellant, was defendant there. From a decree

annulling the pretended marriage between the parties the defendant appealed to the supreme court.

The bill charged that the formal marriage entered into between complainant and the defendant was not a valid marriage; that his consent thereto was obtained by duress, the father and brother of the appellant, having armed themselves with deadly weapons, falsely accused appellee with having gotten appellant with child, forced him to marry her against his will, by threats against his life in case he refused. According to the testimony introduced by the appellant, the appellee, when accused by the father of the appellant with being responsible for her condition, agreed to marry her, and carried out his promise at once. Appellee denied this, alleging that he was not responsible for her condition, and that he at no time admitted his guilt, and only agreed to the marriage when put in fear for his life. It was shown that the father and brother of the appellant went with appellee to secure the marriage license and some competent person to perform the ceremony; that in fact they secured them for him. Soon after the ceremony was performed the (so called) newly married couple went to New Orleans, where the appellee left the appellant, and filed his bill for the annullment of the marriage. The complainant, appellee, did not ratify the so-called marriage at any time after its celebration; did not treat the woman, the appellant, as his wife or receive from her any of the privileges or dues of a husband.

*Claude Pintard* and *A. H. Geisenberger,* for appellant.

This case presents but a few questions of law, and if this court should adhere strictly to the rule which for a time prevailed, that a decree of the chancellor on the facts was similar to a verdict of a jury and would not be disturbed, then it was hardly worth while to have appealed. But this rule of affirming decrees rendered on evidence has been greatly modified by this court, and we are confident that in any ordinary case, if upon consideration of the evidence this court should find that the chancellor was

wrong in his judgment on the evidence, they would not hesitate to reverse.    If this is so in ordinary cases, how much more necessary it is in the case at bar that the court should consider the evidence and affirm or reverse as they might think the evidence justifies, regardless of what decree the lower court may have rendered.

Upon the final result of this case depends the future of a woman who, until the tempter came, bore (so far as the record shows) a spotless reputation, and not like many girls of the present day depended upon a father for a support, but was making her own living in teaching in the public schools of the county; but she is now deprived of this privilege, and unless this court will sustain her in her claim for right and justice she will always share the fate of "Hester Prynne" in the "Scarlet Letter," while the man will continue to engage in his business without loss of means or social prestige.    This for the woman is a hard fate, but with the world at large it is inexorable.

After the candid admission of old man Marsh, that he intended to kill Whittington if he had not married his daughter, and that he would have done so, we think his whole testimony is entitled to full faith and credit, and if his testimony, that the negro Washington could not have heard what passed btween the parties, then Whittington stands uncorroborated by any one, even by a negro.

Great stress is laid upon the fact that old man Marsh stated that he intended to kill Whittington, and he would have done so if he had not consented to marry his daughter.    This intention, if old man Marsh and Levi are to be believed, was never communicated to Whittington, and hence, so far as that intention went, could have had no effect upon his consent to right the great wrong he had done.    When he was charged with being the author of the girl's shame he denied it at first, but when he was told that it could be proved, he then said, "What do you want me to do ?" and the father said, "I want you to marry her," he said, "I am a gentleman, and I will do it."    Old man Marsh says that when

Whittington consented to marry, there was no use of violence; he had agreed to right the wrong, and everything after that time was of his free will and accord.   He (Whittington) wrote the note that night for the license, and when Levi Marsh went to Natchez to get the license he remained alone with the ladies in the house, the old man Marsh being at the store until bedtime, and then coming to the house, where he shortly went to bed.

Whittington was left free to go where he pleased, and there was nothing to prevent him from leaving for parts unknown had he not intended in good faith to fulfill his promise and give his name to the woman he had wronged and to his unborn child. The next day when he, with old man Marsh and Levi came to Natchez, neither old man Marsh nor Levi were armed, and there was no coercion.   He had ample opportunity to have claimed protection when he went to the courthouse for the license, had he so desired.   He voluntarily applied to the clerk for the license, paid for it, and left without saying anything of his being coerced, to his acquaintance, Mr. Frank Robinson, whom he met in the clerk's office.

When they returned to the Marsh residence with the preacher, he had ample opportunity to have told the minister that he was being coerced, and the marriage about to be solemnized was not of his own free will.

Mr. Miller, the minister, says that he did not see anything unusual in his manner, and when he asked the question, "You will take this woman to be your wedded wife?" etc., he answered, "Yes," without any hesitancy, and after the ceremony they all had supper together, and nothing occurred to raise a suspicion in the mind of the minister that anything was wrong in the matter.

To show that the decision to repudiate the marriage was an afterthought on the part of Whittington, we need only to refer to the testimony of Whittington himself, his wife, and her mother and sister.   After the ceremony all parties were together and had supper, the minister with them, and he saw nothing that caused a suspicion of anything wrong.   A short time after sup-

per Whittington retired to his room, and after divesting himself of his clothing went to bed, and shortly after called his wife, who went to the room, and after remaining with him a very short time returned to where the balance of the family were sitting, and after remaining with them a short time, again returned to her husband's room, and after undressing went to bed with him. This is testified to by his wife and also by her mother, Mrs. Marsh, who said that when she went to the room to call them to take the train, they were still in bed together.

Whittington paid railroad fare and went with his wife to New Orleans, and on arrival at the boarding house to which they were taken by the hackman, he stated to Mrs. Shannon: "My name is Whittington, and this is my wife," meaning defendant, who was with him. This action on the part of Whittington going to New Orleans with her and introducing her as his wife, engaged board for himself and wife, was a ratification of the marriage.

*Ratcliff & Clinton,* for appellee.

There can be very little difference between counsel as to the law governing this case. "A marriage is voidable where the consent of the parties is obtained by fraud or duress." 19 Am. & Eng. Ency. Law (2d ed.), 1210. As Bishop, in his work on Marriage and Divorce, puts it: "Where a consent in form is produced by force, menace or duress, a yielding of the lips but not of the mind, it is of no legal effect. This rule which is applicable to all contracts finds no exception in marriage. Nor do the legal principles which govern the question of duress, as applied to marriage, appear to differ essentially from those which govern its application to other contracts."

This case presents two issues. First, did Whittington freely and voluntarily enter into this marriage, or was his consent obtained by duress? Second, did he afterwards ratify the marriage? Both of these questions were questions of fact, and not of law, and both were decided by the chancellor in favor of the appellee, and therefore, this court cannot reverse the decision of

the chancellor unless you reverse it on the facts. "If a verdict is supported by evidence, and the court cannot say that the jury was unwarranted in reaching its conclusion, it will not be disturbed, although a finding for the opposite party would have been more satisfactory to the court." *Railroad Company* v. *Cantrell,* 70 Miss., 329 (s.c., 12 South. Rep., 344); *Railroad Co.* v. *Williams,* 67 Miss., 18 (s.c., 7 South. Rep., 279).

"A verdict of a jury will not be dusturbed unless it is manifest from the whole record that it is clearly wrong." *McAlexander* v. *Puryear,* 48 Miss., 420.

Our court has repeatedly held to the effect, that it would not disturb the verdict of a jury on a question of fact, where there was any evidence to support the verdict.

This court is just as loath to disturb the decree of a chancellor as it is that of a jury where the chancellor's decision turns upon controverted facts. *Apple et al.* v. *Ganong,* 47 Miss., 196; *Wilkie* v. *Collins,* 48 Miss., 496; *Davis* v. *Richardson,* 45 Miss., 499.

Argued orally by *A. H. Geisenberger,* for the appellant, and by *J. A. Clinton,* for the appellee.

Calhoon, J., delivered the opinion of the court.

The contract of marriage, like any other contract, may be annulled on the grounds of duress, such as to deprive the party of his free will. In this case, the chancellor held that there was no free will because of the fear of bodily harm. 2 Nelson on Divorce, secs. 617–622; *Anderson* v. *Anderson,* 147 N. Y., 719 (42 N. E. Rep., 721); *Sloan* v. *Kane,* 10 How. Prac. (N. Y.), 66; *Smith* v. *Smith,* 51 Wis., 665 (8 N. W. Rep., 868); *Marks* v. *Crume,* 29 S. W. Rep., 436 (16 Ky. Law Rep., 707); *Bassett* v. *Bassett,* 9 Bush (Ky.), 696. The chancellor held that there was such duress in this case, and that there was no subsequent ratification, and, on this record, we concur in his holding.

*Affirmed.*