## MAIN v. MAIN.

[74 South. 138, Division B.]

1. MARRIAGE.  *Annulment.  Degree of proof.  Duress.*
   Marriage is not only a contract between the parties affecting their
   personal rights, but is a legal *status* affecting materially the
   public, and although the marriage contract, like all other con-
   tracts, in order to be valid, requires the assent of both parties,
   still where the marriage ceremony has been performed with all
   the requisites and usual solemnity of those rites, the proof must
   be clear and convincing before the marriage will be annulled so
   as to make it void *ab initio.*

2. SAME.
   Where it is sought to annul a marriage contract on the ground
   of duress;  it must be shown by clear, satisfactory, and con-
   vincing evidence that the duress dominated throughout the
   transaction so as to disable the one influenced from acting as
   a free agent at the time of the marriage.

3. MARRIAGE.  *Annulment. Sufficiency of evidence.  Duress.*
   In an action by a husband to annul the marriage on the ground
   of duress, the court held that the facts set out herein did not
   warrant the decree of the chancellor annulling the marriage.

APPEAL from the chancery court of Adams county.

HON. R. W. CUTRER, Chancellor. .

Suit by Albert T. Main against Lillian T. Main to annul a marriage. From a decree for complainant, defendant ·appeals.

Lillian T. Main, the appellant, appeals from a judgment of the chancery court of Adams county annulling a marriage between herself and Albert T. Main, on a proceeding for annullment of marriage filed against Lillian T. Main . by Albert T. Main. The bill alleged that the complainant, Albert T. Main, was coerced into the marrying of Lillian Lehman, alias Main, in the town of Tracy, in the state of Minnesota, in January, 1903; that by reason of the duress and force and fraud used there was in reality no marriage contract; that, at the time of the alleged marriage, the defendant was a resident of the town of Tracy, in said state, and the daughter of one Fritz Lehman, a man of reputed violence. that Fritz Lehman and his son armed themselves with deadly weapons and accused the complainant of having gotten the defendant pregnant, and made threats against his life if he refused to marry her; that he was then a young man only twenty years of age; that he never cohabited with her, left her at once after the marriage ceremony, and repudiated the marriage, · and has never lived·with her since. The prayer was for ·the annulment of the marriage.

The defendant filed a motion for alimony *pendente lite,* and asked for suit money with which to defend the suit. She denied in an affidavit filed with the motion the allegations of the bill, and averred that she was lawfully married to Albert T. Main, and that as the result of the said marriage a son was born, and prayed allowance of suit money and temporary alimony. This motion was overruled by the chancellor for the time being. Appellant then furnished twenty-five dollars to her counsel for suit money and fees, which was all the money she was able, on the statement shown in the record, to furnish. Thereupon an answer was filed, denying the allegations of the

bill, denying the marriage was void, and denying that the
complainant left her immediately after the marriage, and
averring that she and her said husband, Albert T. Main,
lived together for over two years after their marriage,
when he left her on account of business troubles and went
South and assumed the name of Robert T. Dale, under
which name he was known in Natchez, Miss., and alleging
that as the fruit of the marriage there was born a child,
then twelve years of age, residing with her and supported
by her with her own labor, and denying that the complain-
ant was entitled to relief, alleging that he does not come
into court with clean hands, and that he has, by living with
her, ratified the marriage contract even if the court should
find it was entered into under duress and threats.

The answer was also made a cross-bill, in which defend-
ant and cross-complainant alleges the duty of the plain-
tiff to support her and the child; that he is a man of good
business ability and earns a salary sufficient to enable
him to support a wife and child in modest comfort; and
praying for the allowance of a reasonable sum to pay her
solicitors for defending the suit, and for a decree fixing
and allowing permanent alimony.

Albert T. Main testified in his own behalf: That he
lives in Natchez and is engaged in the insurance business
and has been for nearly eight years. That he came to
Natchez from New Orleans, and to New Orleans from
Tracy, Minn. That he first met the defendant in the
summer of 1912, and "of course, as young people will do,
we became familiar. At the time she was visiting a
brother-in-law of hers who was estranged from his wife,
and I knew this. Of course, I knew that certain things
went on; knew as much as a person could know without
witnessing the performance." That "she was a woman
of loose character, and the whole family had that reputa-
tion." That the relations between them developed into
what her brother advised complainant was a state of
pregnancy; "at least, that they laid it at my door." That
he had not seen the girl for nearly two months and had

been firing an engine on the Chicago & Northwestern Railroad and was out of Tracy during that time and had practically forgotten the incident. That, about the last day of December, Lillian's brother took him over to her father's saloon and told him she was in a state of pregnancy and that he was responsible, which he denied, and, after they explained the circumstances, the appellant's brother who was older and larger than the appellee, told him it would be up to him to marry the girl, and that he took a pistol that "looked like one of these German 42 centimeters" and poked it at his stomach and said: "It won't do you any good to run because I will follow you to the end of the world and kill you." That he had nobody to advise with him. That his father was in ill health and in a sanitarium. That the whole thing was a "nightmare for the next two or three days." That at first he refused to marry her, but the next day they hunted him up and kept after him for about three days. That he did not know what was pending, and the whole thing terrorized him in the belief that they would kill him, and that he married under that condition. That the marriage ceremony was performed about eight thirty at night, at the home of the defendant. That her father and mother, the preacher, and the family doctor of both families were present and that he left immediately after the ceremony and has never since had anything to do with her. That the condition they imposed on the marriage was that he should only marry her, and no mention was made of living with her. He also testified that the defendant had a brother who was a half-wit and who, every time he passed him, menaced him, carrying a knife around with him. On cross-examination he stated that he went to the county seat, eighteen miles distant from Tracy, to procure the marriage license; that under the law of Minnesota it was necessary that he should go to the county seat to obtain the license. He testified that his recollection was that some member of the family of the defendant went with him; that they were at the depot, but he won't say that they accompanied him;

that he does not remember as to whether or not they did or did not; that he stayed there about two hours and came back on the next train; that his father was an attorney, but that he did not seek his advice; that the marriage occurred the next night after the license was obtained. He testifies that Dr. Workman of Tracy, Minn., was the physician, but, when asked as to a conversation had with Dr. Workman, replied that he did not care to answer, as "it was a little hazy;" that no one went with him to the home of the defendant the night of the marriage and that he went alone, through the snow; that his father is now dead but lived about two and one-half years after the marriage ceremony; that he did not talk to his father about an annulment of the marriage; that he remained in Tracy about thirty days after the marriage and went from there to Minneapolis, and remained there about nine or ten months, and then went to Dakota and stayed there about seven months and returned to Minneapolis, and was away, altogether, about two years; that he remained in Tracy about two years after he returned, before coming South. He testified that he is now earning about twenty dollars per week in the insurance business at Natchez. He admits writing some letters appearing in the record, requesting the appellant, who was living at Missoula, Mont., to institute proceedings against him for divorce, and that he would pay the expense of obtaining a divorce and she might place the divorce on any ground that she desired. He also conducted negotations through these letters to find how much money she would take to release him from his obligations to her.

The complainant introduced Harry Rogers to support his statements in reference to the said marriage. Rogers testifies that he did not know Albert T. Main personally prior to January, 1903, but knew him following that date for a period of years, and that he knew Lillian Main for two or three years after her marriage, but had not seen her for four and one-half years; that he did not attend the wedding, knew nothing of his own personal knowledge,

and testified only from hearsay and what he considered reliable authority; that from this he testifies that Albert T. Main left Tracy immediately, but Mrs. Main remained several years; that he cannot state from personal knowledge, but that it was a well-known fact that Albert Main left immediately and did not return for several months, and, subsequent to his return, witness and Albert T. Main became intimate friends. This is the substance of all the testimony for the complainant.

This testimony is contradicted by deposition of Mrs. Main, who testified that complainant married her voluntarily and. lived with her for about three years after the Marriage; is contradicted by Frank C. Lehman, brother of the appellant, who testifies that they did not use any duress or coercion, and that Albert Main lived with Lillian Main for about two years after the marriage, living as members of his father's family, and that they treated him as a member of the family and were kind and considerate to him.

Dr. Workman, the physician of both families, testifies that he had a conversation with Albert Main prior to the marriage and advised him to marry the girl, and that Main admitted to him that he alone was responsible for her condition and that he consented to marry; that he was present at the marriage between the parties, and it was entered into voluntarily, from all appearances; that Albert Main remained at the residence, joined in the conversations, and was. apparently satisfied with the marriage; that Main lived there for some time afterwards, and he saw them together at different times, but did not know whether they cohabited as man and wife or not. He also testifies that the reputation of the Lehmans for peace and violence is good; that they were regarded as good, law-abiding citizens, and were in good standing in the community; that he had treated Lillian, the defendant in the suit, about two years prior to the marriage, and at that time she was a virgin, having an unperforated hymen; that he had observed her conduct throughout her

life, having been her neighbor, the family physician, and a trustee of the school; and that he saw nothing in her conduct that was improper.

H. F. Seiter, a citizen of Tracy, Minn., fifty-six years of age, a banker and real estate man by occupation, testified for the defendant that he had known defendant since her birth; that he knew her father; that her father was an honest, law-abiding and conscientious man; that the Lehmans were never known to have a fight or show any tendency to do so; that he knew the complainant as Allie Main, but did not know his initials; that the father of Lillian talked with him about her condition a short time before the marriage, and he (Seiter) advised him it was the proper thing for them to marry; that Mr. Lehman came back and told him that Allie was willing to marry Lillian, but the mother did not have any faith in Allie; that he advised them to have the marriage; that Fritz Lehman, the father of Lillian, seemed at the time to be overwhelmed with sorrow, and stated that he did not think the boy would amount to anything, but that he showed no viciousness towards Allie nor any tendency toward it. He also testifies as to the good standing of the family in the community, and that the appellant bore a good reputation in the community for moral character; that he never heard anything against her prior to her transaction with Main and never saw anything unladylike or suggestive, and that he saw her almost daily; that he saw Allie Main in his father's law office a good deal and about the street, during all this time; that he never had any reason to believe and heard no threats of violence; that, from his knowledge of the father of Albert Main, he believed he would have advised his son to marry the girl; that Albert Main stayed at Tracy for a year or more; that he saw them both in Tracy during the time, but could not say whether they cohabited as man and wife.

David H. Evans, witness for the defendant, resident of Tracy, Minn., sixty-two years of age, hardware and grain merchant, one-time mayor, member of the school

board, member of the state reformatory board, director of Citizen's State Bank, president of the Tracy Cement Tile Company, president of the Implement Fire Insurance Company, vice president of Retail Hardware Dealers' Fire Insurance Company, testified that he has lived in Tracy for thirty-seven years; has known Lillian Main since her birth; saw her at school, on the streets, and in her home; well acquainted with the family; without personal knowledge of the exact state of affairs, but knowing something of the relations between them in a general way, states that Albert T. Main married Lillian to fulfill a moral obligation to her; that the father of Lillian called on him and went over his troubles with him and expressed himself as not being desirous of the marriage between Albert and Lillian, but under the circumstances would offer no objections; does not know of any violence toward Main by Mr. Lehman; that the father expressed himself as being reluctant in his approval of their marriage; that he saw him almost daily, and never saw any inclination to violence or a tendency toward quarrelsomeness, on the contrary, he knew him to be a peaceable and agreeable law-abiding citizen; saw Albert T. and Lillian Main together after their marriage; once met them conversing together in the office of Chas. W. Main & Son.

The chancellor on this evidence granted a decree annulling the marriage between the appellant and the appellee.

*Brandon & Bowman,* for appellant.

*B. W. Crawford* and *C. F. Engle,* for appellee.

ETHERIDGE, J., delivered the opinion of the court.

Marriage is not only a contract between the parties affecting their personal rights, but is a legal *status* affecting materially the public; and the public as well as the parties have an interest in the marriage *status*. And

although the marriage contract, like all other contracts, in order to be valid, requires the assent of both parties, still, where the marriage ceremony has been performed with all the requisites and usual solemnity of those rites, the proof must be clear and convincing before the marriage will be annulled so as to make it void *ab initio.*

"Where it is sought to annul a marriage contract on the ground of duress, it must be shown by clear, satisfactory, and convincing evidence that the duress dominated throughout the transaction so as to disable the one influenced from acting as a free agent at the time of the marriage." *Beeks* v. *Beeks,* 66 Fla. 256, 63 So. 444.

In the instant case it is sought to annul the marriage and make it void from the beginning, the effect of which will be, if permitted, to render the child born a bastard and to place upon the woman in the case the stigma of impurity; and it is a familiar rule of law that, where a situation arises under which one person will suffer wrong and injury because of the situation, the law will favor the one who is not responsible for the situation, if that be reasonably possible under the circumstances. In the present case the proof for the complainant, if taken alone, is far from being satisfactory and convincing. It appears that the marriage, or so-called marriage, was solemnized in 1903, and the bill was not filed until some twelve or thirteen years thereafter. Under the appellee's testimony, he lived for some years in the town where the relatives lived, separate from the woman, without any effort being made to molest him. The courts were open during all this time to the annullment if the marriage was brought about by duress. We find from the letters in the record that he had solicited Mrs. Main to procure a divorce at his expense on any ground which she might choose as a ground for divorce and he would pay the expense of this procurement. It appears from the appellant's testimony (which is not disputed by the appellee, though he testified) that he had written her a letter soliciting her to come to Natchez and live with him as his wife, which she refused

to do. It appears that the letters written, while not expressly recognizing the marriage, necessarily recognized it in urging the appellant to procure a divorce from the appellee. It appears that the appellee was reared in the town of Tracy, Minn., where the alleged marriage took place, and, if the facts relied on by appellant for annulment of the marriage were true, it would have been an easy matter to have established the facts by evidence of other parties living in that place. His family and friends and (presumably) relatives lived there, and some person must necessarily have been familiar with the facts; yet the only witness produced is one who moved to Tracy shortly after the alleged marriage, and who did not know either the appellant or appellee until after the marriage, and who was not at the time of taking his deposition a resident of that place, and who testifies that he had no personal knowledge of the facts he undertook to testify to. As stated, this testimony of itself it not as strong as ordinarily it should be in a case of this kind to procure an annulment of the marriage, which requires a higher degree of proof than the ordinary civil contracts between parties. When this testimony is considered with the testimony for the appellant and the witnesses on her behalf, three of whom are old citizens and residents, and shown to be men of character and standing in that community, it so completely outweighs the testimony of the appellee and his witness as to make it impossible to uphold the judgment in this case annulling the marriage. Some authorities go to the extent of holding that where a marriage is entered into, so as to escape the consequences of a situation like the one before us now, either from fear of prosecution or violence of the relatives, the court ought to deny an annulment at all because of the responsibility for the condition that arises resting upon the party alleged to have been coerced. 19 Am. & Eng. Enc. Law, 1189. While we do not mean to hold that annulment will not be granted where the proof is clear that duress was used, we believe in this case that the great weight of proof

is with the appellant, and that the appellee failed to meet the requirements, imposed by legal rules, to annul the marriage.

There being a cross-bill praying for alimony *pendete lite* and permanent alimony, and there being no evidence in the record as to a reasonable attorney's fee, we think that the decree of the chancellor should be reversed, the bill of complaint dismissed, and the cause remanded, with directions of the court below to make such allowance for alimony and attorney's fee as may be proper.

.                    *Reversed and remanded.*