WHITE *v.* WILLIAMS *et al.*

(En Banc. Feb. 23, 1931.)

[132 So. 573. No. 29045.]

Ruth Campbell, of Yazoo City, for appellant.

Barbour & Henry, of Yazoo City, for appellees.

Anderson, J., delivered the opinion of the court.

Appellees, brother and sister of Clem White, deceased, filed their bill in the chancery court of Yazoo county

against the appellant, widow of said decedent, under sections 2790 and 2791 of the Code of 1906, Hemingway's Code of 1927, sections 325 and 326, to have themselves declared the sole heirs at law of said decedent, and to that end to have set aside and annulled the marriage of appellant and the decedent. Appellant demurred to the bill, which demurrer was by the court overruled; from the decree overruling the demurrer appellant was granted an appeal to settle the principles of the cause.

This is the second appearance of this case in this court on bill and demurrer. White v. Williams et al., 154 Miss. 897, 124 So. 64. On the former appeal the decree was reversed and the cause remanded. For a statement of the case up to the time of the former appeal, reference is made to the opinion of the court rendered on that appeal.

On remand of the case to the trial court the original bill was amended by adding the following paragraph:

"Petitioners allege that the said Clem White was wholly non compos mentis at the time of the pretended marriage to the said Sophie Jones White, and this condition was known beyond doubt to the other party, the said Sophie Jones White, and so knowing, the other party, the said Sophie Jones White, procured the said marriage for the sole purpose of fraud, and went through the formal ceremony of marriage as an iniquitous pretense only, and there was no sort of consummation of the pretended marriage by the living together of the parties even to the extent of an ostensible assumption of the relations of the marital state."

The bill, so amended, was demurred to by appellant, the demurrer was overruled, and this appeal was granted from that decree.

In order to affirm the decree appealed from, Ellis v. Ellis, 152 Miss. 836, 119 So. 304, must be overruled. The bill in the Ellis case alleged that the marriage was with a person wholly insane, which was known to the other party; and so knowing, the other party procured the mar-

riage for the fraudulent purpose of going through the marriage ceremony in order to inherit the property of the insane spouse in case of his death, and that there was no sort of consummation of the pretended marriage by the living together of the parties. The insane spouse in that case was the husband, who died soon after the marriage. A brother of the insane husband sought to annul the marriage on that ground, as well as on another not necessary to mention. The court held that the marriage was voidable, but not void, and was therefore not subject to collateral attack—that it could only be attacked during the lifetime of the parties. We are not willing to overrule that case, although it is true that it lays down a principle that might result in harm in unusual cases.

At common law a marriage with an insane person was void, and could be attacked collaterally. Ward v. Dulaney, 23 Miss. 414; Smith v. Smith, 47 Miss. 211. But the common-law rule was changed by the Code of 1857, chapter 40, article 15, page 334, which provides that neither insanity nor idiocy of either party at the time of the marriage is sufficient ground for a divorce; but in addition thereto, the other party must have been at the time of the marriage ignorant of such disability. This statute has been enacted in the same form as it appeared in the Code of 1857, in every Code adopted since then. It will be found in the eighth paragraph of section 1414 of the Code of 1930.

In Smith v. Smith, supra, the court held that this statute made two modifications of the common law: First, that insanity at the time of the marriage did not make void the marriage contract; second, on the dissolution of such a marriage the issue was not bastardized. In discussing the effect of the statute on the common law, the court used this language:

"In none of the revisions of the statutes, prior to 1857, was insanity mentioned as one of the causes of divorce. Prior to that time the subject was dealt with as at com-

mon law. That code made insanity cause of absolute divorce, 'if the other party was insane at the time of the marriage, and the party applying did not know of such insanity.' It is a principle common to the law of contracts, quite as applicable to marriage, as to those which are purely private, and terminate, in their influences and effects, with the immediate parties thereto, that if either party was deficient in intellect, so as not to have the power of will and assent, as to such person, the contract was of no effect. Therefore, the common law denounced a marriage with an insane person as void, because of inability to assent thereto. The case of Ward v. Dulaney, 23 Miss. 414, arose prior to the revision of 1857, and was decided under the common law. It were quite impossible to lay down a general rule, to measure with precision the degree of mental imbecility or intellectual alienation which will suffice to annul the marriage contract. It may be safe to say that there ought to be enough of capacity to comprehend the subject, and the duties and responsibilities of the new relation. 23 Miss., supra. The statute makes two modifications of the common law: first, insanity at the time of marriage, does not make void the matrimonial contract, but in addition thereto the party applying must not know of its existence; second, upon dissolution, the issue shall not be bastardized. The statute meant to deny a divorce when the applicant for it was aware of the insanity at the time of the marriage, and then also to make legitimate the issue of the marriage, although it might be dissolved. This we suppose to be the extent of the change made of the common law. The statute, like the old law, referred the insanity 'to the time of the marriage.' ''

There have been five codes adopted in this state since the Code of 1857. As above stated, in every one of them this statute has been re-enacted in the same form as it appeared in the Code of 1857. One of the long-established rules of statutory construction is that where a

statute has been construed by the supreme court, and afterwards re-enacted in substantially the same terms, the legislature by such re-enactment adopts such construction along with the statute. Shotwell v. Covington, 69 Miss. 735, 12 So. 260; Wetherbee v. Roots, 72 Miss. 355, 16 So. 902; Hoy v. Hoy, 93 Miss. 732, 48 So. 903, 136 Am. St. Rep. 548, 17 Ann. Cas. 1137, 25 L. R. A. (N. S.) 182 note; Hamner v. Yazoo Delta Lumber Co., 100 Miss. 349, 56 So. 466; Henry v. Henderson, 103 Miss. 48, 60 So. 33; Womack v. Central Lumber Co., 131 Miss. 202, 94 So. 2; Burks v. Moody, 141 Miss. 370, 106 So. 528, 107 So. 279.

The legislature, in re-enacting the statute, is presumed to have known the construction put upon it by the supreme court in the Smith case.

If the facts set out in the appellees' bill in this case be true, appellant will inherit the estate of her deceased husband as the result of her own iniquitous fraud. However, it must be borne in mind that there is no such thing as a perfect system of laws. Our system of common law consists of general rules that have been found by long usage to work out justice in the great majority of cases. In exceptional cases these rules work out injustice, but such cases are rare. The decisions of the supreme court constitute a body of precedents that should be followed by the courts in subsequent causes, when applicable, unless they are manifestly wrong and mischievous in their results.

Probably in this connection it would be very well to repeat the following language used by the court in its opinion on the former appeal of this case:

"It must be admitted that, under the principles laid down in the Ellis case, fraudulent marriages with insane persons may take place, resulting, on the death of the insane, defrauded spouse, in his or her estate being diverted from its rightful course of descent and distribution. On the other hand, if would-be heirs were permitted, after the death of the insane defrauded spouse,

to attack the marriage in order to inherit the estate of such deceased spouse, we think the gates of fraud would be opened still wider. The incentive to perjury would be great in many cases, especially where there was no issue of the marriage, and the marriage had taken place against the wishes of those attacking it. It is often an illusive question whether a person is sane or insane, and the extent of the insanity, if any, whether or not the person is so unbalanced mentally as to be incapable of understanding the nature of the act being inquired into. Alienists of high standing and great learning often differ on this question. In many cases, the testimony of the person himself, alleged to be insane, has a material bearing on the question; if his mouth is closed by death, material evidence cannot be had. Where one of the parties to a marriage is incapable of entering into the marriage state because of insanity, and the other party, knowing of such insanity, fraudulently induces and brings about the marriage, in order to inherit the estate of the insane spouse in case the latter should die first, any member of the family of the insane spouse sufficiently interested could have a guardian appointed, and by a proper proceeding in court through such guardian have the marriage annulled in the lifetime of the parties. In other words, the defrauded insane spouse, during the lifetime of the parties to the marriage, could enforce his rights in the courts.''

Reversed and dismissed.

**Smith, C. J.,** delivered a concurring opinion.

The question for decision is: Is the marriage of an insane person void? If it is, the decree of the court below should be affirmed, but. if not, it should be reversed.

At common law, such a marriage was void, and therefore a nullity. could not be ratified by cohabitation, Ward v. Dulaney, 23 Miss. 410, was subject to be attacked col-

laterally, and the issue thereof were bastards. This rule has been changed by statutes in some of the states under which such a marriage is not void, but may be annulled or dissolved in a judicial proceeding prior to the death of one of the parties thereto. Such is the effect of the statute now appearing as section 1414, Code of 1930, which provides that:

"Divorces from the bonds of matrimony may be decreed to the injured party for any one or more of the eleven following causes,' viz: . . . Eighth.—Insanity or idiocy at the time of the marriage, if the party complaining did not know of such infirmity."

While the statute does not expressly so declare, its necessary and inescapable implication is that the marriage of an insane person shall no longer be void, but shall be valid and remain in force unless and until it is dissolved in a suit for divorce. Note its language: 'Divorces from the bonds of matrimony may be decreed.' "Divorces" are dissolutions or suspensions of the marital relation, and unless such relation exists no divorce is necessary. Moreover, "from the bonds of matrimony" is an express recognition that such bonds exist, a clear negation of the common-law rule that no such bonds result from the marriage of an insane person.

The qualification of this right to a divorce because of insanity of one of the parties at the time of the marriage, to the extent that the party applying for the divorce must not have known of the insanity of the other, cannot be held to limit the clear recognition by the statute of the validity of the marriage. It is but a statutory application of the maxim "that he who has done iniquity shall not have equity." The statute was wholly unnecessary and serves no useful purpose, if the common-law rule that the marriage of an insane person is void remains in force.

Furthermore, as stated in the opinion in chief, the statute was so construed in Smith v. Smith, 47 Miss. 211,

since which it has been repeatedly re-enacted, and therefore, under many decisions of this court, the construction there put upon it should not now be departed from.

**Griffith, J.,** delivered a dissenting opinion.

In addition to the facts mentioned in the majority opinion, it is admitted by the demurrer that at the time of the pretended marriage the victim was wholly insane in consequence of pellagra of the brain, an incurable mental disease from which death ensued within four weeks from the date of said illegal, pretended marriage. It is a matter of which the court may take judicial knowledge that the said disease when it reaches the state of insanity is not only incurable but is physically progressive. It is admitted that the woman knew all this, that her sole purpose was to inherit property, and that she made all the arrangements for the pretended marriage knowing that the death of the insane sufferer was inevitably soon to occur; and it is further admitted that at the time the said sufferer was "in no physical or mental condition to understand the nature of the supposed marriage contract or to give his consent thereto;" and, as stated in the majority opinion, "there was no sort of consummation of the pretended marriage by the living together of the parties even to the extent of an ostensible assumption of the relations of the marital state." The admitted allegations are not only of a total want of mental capacity, but there is the admitted allegation of the want even of physical capacity—in a word, the victim was a corporal and mental imbecile.

It will thus be seen that every element which in the common understanding of all men is essential to constitute a marriage is entirely absent in this case, and in their place there exists only fraud, false conduct, and iniquity. Instead of conscious consent, or the ability physically or mentally to consent, or anything whatever that can

rationally be said to be equivalent thereto, there is nothing but an empty form, a brazen counterfeit. And the fraudulent performance has no more actual validity, although it pass the majority of a court, than would a counterfeit bill be anything but still a counterfeit, although it passed current for the time being in a whole community or in an entire state. Here was a pretended marriage ceremony with a lunatic, a person wholly without mind, a person who was, therefore, no more than an impotent idiot, with a pitiful creature who was nothing other than a wasted and diseased frame of bone and flesh, without human conceptions, without the physical or mental capacity present or future to consummate the relation, with a being who so far as any substance of effect was concerned may as well have been across the ocean, all at the fraudulent procurement of the other party, and with no purpose other than fraud, and yet it is said now to have all the sanctities under the law that belong to the highest conventional estate known to civilized society. Under the holding of the court here, if two lunatics, utterly insane, confined in an asylum, but being harmless, are at certain hours allowed the privileges of the grounds, should contrive to go through a marriage ceremony under the forms of law, although never for a moment actually consummated, they would be husband and wife with all the legal obligations imposed by law upon a husband, and if either should die before decree of annulment, then the void ceremony would become invested with all the finality of absolute validity. And if one of these should recover his or her sanity, and having no mind or memory respecting the previous marriage ceremony, and no other person remembering it, should on being released from the asylum, marry again and rear a large family and with the aid of spouse and children accumulate a comfortable estate, and should die while the first or lunatic spouse yet lives, then the second marriage would be bigamous and void, the children bastards

and their estate swept away. Under the majority holding here, if some widower, with young and dependent children, on a distant journey and among strangers, should be injured so as to be wholly bereft of consciousness, and just before his impending death some woman attendant, herself an utter stranger, should secure the performance of a marriage ceremony, this, as the court says, would be valid, although the death rattle in the throat of the dying man commingled with the words of the impious ceremony, and the ink had scarcely become dry on the fraudulent certificate before the faint and flickering flame of life went out.

And it is said that all this must be so because it is the law. It has become indeed with the decree in this case a fictitious rule of adjudication, but it cannot be law; for there is an uncompromising enmity and eternal war between law and equity on the one side, and the forces of fraud and iniquity on the other. To say that fraud and iniquity is law, or is ever within the law, is to assert that which carries its own contradiction, manifest upon its face. And when, as in this case, there is nothing on the one side except fraud and iniquity, and that too of the starkest and most repulsive character, and there comes a pronouncement that these enemies of law are admissible within the bosom of the law, there to be given comfort and protection, it can be taken as a certainty that the pronouncement is not the law, even though a judicial precedent be found for it, and the court refuses to correct the error.

The judicial precedent relied on is the opinion in Ellis v. Ellis, 152 Miss. 836, 119 So. 304, 305. That case was appraised by the bar of the state as being unsound when it first came out, but neither the court which issued it, nor the bar in passing judgment on its soundness, perhaps ever foresaw the bottomless pit to which it would lead, one abysmal view of which is seen in the facts of the present case. The basic error in that case is the con-

fusion of annulment of marriage with divorce, and thereupon proceeding as if there could be no annulment unless the ground therefor is found in the divorce statutes. That such a view is palpably unsound is at once disclosed, when, on looking to the divorce statutes, there is found no mention therein, for instance, of duress as a ground, yet duress as a cause for annulment of marriage has been recognized without question throughout the history of this state, and is expressly upheld in Marsh v. Whittington, 88 Miss. 400, 40 So. 326, and in Main v. Main, 113 Miss. 165, 74 So. 138, 141, in which latter case it was said that the ''marriage contract, like all other contracts, . . . requires the assent of both parties.'' In Antione v. Antione, 132 Miss., at page 445, 96 So. 305, it was distinctly pointed out that the statutes on divorce do not refer to annulment suits. The difference between annulment and divorce is most strikingly shown by the fact that in South Carolina divorce is prohibited by the constitution, yet annulments are permitted, the court in that state saying that ''the great weight of authority elsewhere is to the effect that courts of equity have jurisdiction to declare marriages void even where there is no statute regulating the subject.'' Davis v. Whitlock, 90 S. C. 233, 73 S. E. 171, 174, Ann. Cas. 1913D, pages 541, 542.

Indeed, the original jurisdictions in divorce and in annulment come from different sources. Divorce originally was solely within the jurisdiction of the ecclesiastical courts, and since no such courts have ever existed in this country, that jurisdiction necessarily had to be conferred by statute, and there can be no divorce except upon causes expressly found in the statute. On the other hand, the jurisdiction in annulment comes from the general equity powers of the chancery court upon grounds for which equity gives relief in cases of gross fraud, duress, want of mental capacity and the like. There is no substantial division among the authorities, many of which are col-

lated in the notes, 38 C. J., pp. 1348, 1349, that a court of equity in the exercise of its inherent constitutional powers will take jurisdiction of suits involving annulment of marriage on the ground of insanity in the same way and to the same extent that equity gives relief in respect to void contracts generally. If therefore there be anything that can be said to be settled on principle and on authority, not only in our state, before the Ellis case, but elsewhere, it is that the jurisdiction of equity in annulment is independent of divorce statutes, and that the statute on divorce is not controlling or exclusive in proceedings to annul; and in consequence as to annulments, we are carried back to the common law. On that law there is no weight of difference among the recognized standard authorities: "The marriage of parties, one of whom was at the time of its celebration insane, is void, in distinction from voidable. . . . The consequence of this doctrine is that the defect may be relied upon, in avoidance of the marriage, not only in a suit between the parties, to set aside, but in any cause, between the same parties or any other, wherein either during the life of the married persons, or afterward the marriage is judicially called in question." 1 Bishop Marriage & D. section 136. See also section 125. Another standard authority says: "The marriage of one mentally incompetent is void and according to the weight of authority where for want of the requisite mental capacity on the part of one of the parties there has been no consent to the marriage contract the purported marriage is an absolute nullity and will be so decreed in any court and in any proceeding where the question may arise, whether during the lifetime of both of the parties or after the death of either of them." 2 Schouler on Marriage (6 Ed.), p. 1374.. See also 18 R. C. L., pp. 443, 446, 447, and 2 Blackstone, pp. 438, 439. To all this Mr. Bishop adds, section 135, and it is pertinent to this particular case, that "the two ingredients of fraud and insanity, thus blended to-

gether in matrimonial causes, often produce, by their united action, a nullity which neither of them could alone effect." Even the Ellis case concedes the above statement to be the law unless changed by statute, but then undertakes to show that there has been a change of the rule in this state by statute, and in so undertaking departs entirely from the field of inquiry in respect to annulments and goes over into the statutes on divorce, and relies on the eighth paragraph among the causes for divorce, which paragraph is as follows: "Insanity or idiocy at the time of the marriage if the party complaining did not know of such infirmity."

In the first place, the very language of that paragraph shows that it was dealing only with the right to complain by the sane party. It has no reference whatsoever, as it plainly shows on its face, to the rights of the insane party in the premises, and the Ellis case, just as this case, presents the reverse of that covered by the said eighth paragraph above quoted, for in these cases the complaint is on the part of the insane party. As to the insane party and those who are his representatives, the statute quoted is silent and being silent it, therefore, in that respect makes no change in the common law, and that law is, as already quoted, that so far as the insane party is concerned the purported marriage is a nullity "and will be so decreed in any court and in any proceeding where the question may arise, whether during the lifetime of both of the parties or after the death of either of them." That the quoted paragraph of the divorce statute did not deal, and did not undertake to deal, with the entire subject of insanity in marriage, but covers only the complaint expressly therein mentioned, is further demonstrated by the case heretofore put; that is, where both parties are insane at the time of the marriage. Is it to be pretended that the quoted clause applies in the latter case? That it does not is too plain for argument.

That the opinion in the Ellis case departed wholly from the field of annulment and went over completely into that of divorce, losing all sight of the marked differences between them, is shown by the only local cases cited and relied on in that opinion. These cases are Smith v. Smith, 47 Miss. 211, and Wilson v. Wilson, 104 Miss. 347, 61 So. 453. Both were divorce cases, as stated at the very outset of each of them. In the Smith case the parties had actually lived together for three years, during which time a child was born to them, and in the Wilson case they had lived together for six years, and in both cases the application was on the part of the sane spouse and on the ground that the defendant, the other spouse, was, without the knowledge of complainant, insane at the time of the marriage. The fact that the parties have actually lived together and children are born to them removes any case of that kind from the jurisdiction in annulment, and leaves divorce as the only remedy. In such case equity refuses its aid under its general equity powers. And it may be conceded that this is true even as to an insane person, if that person has sufficient mental and physical capacity to perform the duties of the marital state in any sort of manner acceptable to or bearable in that relation, and the parties have lived together for a sufficient time that their status as man and wife has become a substantial one in the social community, as distinguished from a status purely technical; for then there would be no equity, that is to say, indispensable equity, in support of the annulment, but that then divorce would be the only remedy. Such were the Smith and Wilson cases, and whatever language was used by the court in either of them must be referred to the subject-matter and the facts of the cases then before the court. The subject-matter was divorce, after long cohabitation, the facts were as above stated, and the applications in both cases were by the sane spouse. It is the universal rule in the application and interpretation of judicial decisions that the opin-

ion is to be read within the subject-matter and the facts, and that general observation beyond those two is not decision, but is only discussion. But the Ellis case picks up some of the general language of the Smith case and takes it not only beyond the facts of that case, but even beyond the subject-matter. Remembering now that in the Smith case the parties had lived together three years, that a child had been born to them, that the case was for divorce, on the application of the sane spouse, and under the quoted section of the divorce statute, the court said: "The statute [that is to say the statute when divorce is the subject in hand] makes two modifications of the common law: first, insanity at the time of marriage does not make void the matrimonial contract, but in addition thereto the party applying must not know of its existence; second, upon dissolution, the issue shall not be bastardized. The statute meant to deny a divorce when the applicant for it was aware of the insanity at the time of the marriage, and then also to make legitimate the issue of the marriage, although it might be dissolved. This we suppose to be the extent of the change made of the common law."

The court there said that there was no complete change in the common law in respect to the marriage of insane persons, but that as to the sane spouse marrying an insane person knowing of the insanity at the time, he should have no relief and as to him the marriage should remain valid; and that this was the extent of the change in the common law; and under the facts no more was said or could have been said in the Wilson case. But what about an application on the part of the insane spouse, or where both were insane and there was no sort of consummation of the pretended ceremony? Neither the Smith nor the Wilson case touches that question, but the Smith case expressly says that the change in the common law as applicable to the facts in that case was the extent of the change. That the statute has no reference whatever to

an application on the part of the insane party is perfectly apparent when it is seen that the knowledge vel non of the insanity at the time of the marriage is the essential and controlling element in the statute—and then how can the insane party have in a legal sense any knowledge in the premises one way or the other?

Moreover, to give to the statute the construction that is given it in the Ellis case, and as that case erroneously says was given in the Smith and Wilson cases, would be to bring the sane party in this case "within what might be justly termed the iniquity of the statute. . . . We cannot think it was ever contemplated by the legislature that the statute should be so construed as to abrogate the maxim that no one can gain a right by his own wrong." Scott v. Scott, 73 Miss. 575, 579, 19 So. 589. No apter language could be found in our books than that of Judge Cooper just quoted. Who is it that gains a right in this case? The woman who contrived this iniquitous and fraudulent marriage. And that she did this wrong, with no other purpose than to gain a right by it, is admitted by her as the facts in this case. So we have the naked proposition here that the court is holding that this appellant has gained a right based solely upon her active and conscious wrong. It is a stark proposition and its nakedness cannot be covered up or hidden. Its nakedness is not the least hidden by the assertion that the annulment must be during the lifetime of both parties, first, because the law, in the absence of express statute, says to the contrary, as has been already shown by all the standard authorities, and, second, because the wrongdoer can the more effectually, under such a holding, make the fraud irremediable by delaying the pretended ceremony until death is at the very door sill; in other words, the more reprehensible the wrong, the nearer it is brought to the actual fact of death, the more effectual it will become, which is to say, the greater the wrong the stronger the right thereby gained.

But it may be attempted to say, as an answer to the above, that a marriage could not be void as to one party, that is, as to the insane party, and only voidable as to the other, the sane party; that they must stand on the same footing, so that if void as to one, it must be void as to both, or if only voidable it must be so as to each alike; that the divorce statutes could not be so construed as to produce a difference in marital status between the parties. This fallacy is fully answered by the fact that by section 1422, Code of 1930, and by all the codes for more than half a century, it is expressly provided that a divorce may in certain cases be granted to the innocent party, and its operation refused to the guilty party who "shall remain in law as a married person." If a marriage can be wholly dissolved as to one spouse and left wholly undissolved as to the other, then there is no difficulty in the proposition that it may be void as to one and voidable as to the other.

The first three cases from other jurisdictions cited in the Ellis opinion are equally, indeed are more, out of point, since they are cases that were controlled by statutes expressly dealing with all cases of annulment, as well as divorce. Moreover, the first case cited, Mackey v. Peters, 22 App. D. C. 341, was while the parties were yet living, and the fact that express statutes, not requiring construction, governed the case is seen at pages 350, 351, of that report. The second case, Wiser v. Lockwood, 42 Vt. 720, is completely out of point, because, first, the suit there was at the instance of the alleged insane spouse to uphold her rights in dower, so that the insane person was seeking to uphold the marriage, not to avoid it; second, there had been a consummation by cohabitation; and, third, the case was rested upon statute. It is particularly interesting in connection with this Vermont case to note that Mr. Bishop, sections 92a and 137a, expressly pointed out the general unsoundness of this said Vermont case. The third citation, from the California court,

In re Gregorson, 160 Cal. 21, 116 Pac. 60, L. R. A. 1916C, 697, Ann. Cas. 1912D, 1124, is peculiarly illustrative of the error in hastily looking to particular outside cases for authority, and in standing on those that are controlled by express statute, for the California statutes not only completely deal with annulment in all its phases, but expressly provide further that any suit therefor shall be brought within the lifetime of the parties.

But more unfortunate than the three citations above mentioned is the last or fourth citation in the Ellis case of an authority from another state. This citation is Guthery v. Wetzel, 205 Mo. App. 664, 226 S. W. 626, in which it was held that only the parties could annul a marriage, and that it could not be attacked by heirs. This is an unfortunate citation, because in the very next year, by the same court, by the same judge, and in the same case, the Missouri court in Guthery v. Bell, 206 Mo. App. 570, 228 S. W. 887, overturned its first decision, and sustained a bill in equity by the heirs after the death to annul a fraudulent marriage with a person wholly incompetent to enter into the contract or to consummate the purported relation, and placed its difference in decision on the ground mainly that the first case was in probate control entirely by statute, whereas the second presentation was in equity under the full powers of the principles of the equity courts.

Marriage without the consent of the parties has always been odious to the free people of this country, and, with the abolition of slavery, the last remnant of it disappeared from among us. The patriarchal principles and practices of the Eastern Hemisphere, and especially of oriental and semibarbarous nations, where marriages are largely controlled by family or tribal despotisms, without regard to the consent of the immediate parties, has never received toleration here; and it would be none the less odious if attempted directly or indirectly by the state itself instead of the smaller despotisms of inner circles.

Mr. Bishop says, volume 1, section 94: "We have already seen, that consent is the essence of marriage without which it cannot exist. A government which would compel people into matrimony without their consent could not be endured." Even Mr. Cooley, the most conservative of all commentators on constitutional law, says, 2 Cooley's Const. Lim. (8 Ed.), p. 778: "For the legislature to marry parties against their consent, we conceive to be decidedly against the law of the land." It may be confidently asserted, therefore, that consent to marriage is an element so fundamentally essential as to be beyond the power of our legislature to dispense with or to substantially disparage. A marriage that has any legal existence imposes upon the husband and upon his estate the obligations of the support and maintenance of his wife, and liability for necessaries furnished to her, and this is true although he be insane. 1 Bishop, Mar. & D., section 565. There is no principle of constitutional law which is more firmly established than this: That no man can be made liable in obligation or estate to or for another private person except upon his rational consent, or upon that which is equivalent thereto; and there can be no equivalent as against a corporal and mental imbecile, as we have in this case. And since an insane man is incapable of consent, and since a corporal imbecile can have no status erected against him; then a person with both these infirmities cannot be bound by a marriage ceremony in that condition, wholly so; and legislation which would attempt so to bind him, there being no establishment in the body of society of an actual marital state by cohabitation, would itself be void. The strained construction put upon the quoted statute by the Ellis case is, therefore, not only outside of and beyond the statute, but would, as applied as to the corporal and mental imbecile and as binding on him, lead it into conflict with constitutional principles, and no statute will be given that construction when the words thereof do

not clearly and unmistakably require it—to say nothing of a construction which would consecrate simulated marriages admitted to have been of no other purpose than in fraudem legis. Particular attention is here called to what Mr. Bishop says on the very point dealt with in this paragraph, and covered by him in 1 Bishop, Mar. & D., sections 90a to 95, particularly his summary in section 95.

It is not necessary to notice at any length that part of the argument in the Ellis case to the effect that because the statutes have declared certain marriages void, then it follows that all others are voidable only. It would follow with as much reason that all others are valid; and upon the same reasoning it could be said that since section 263 of the constitution expressly makes void only the one particular marriage therein mentioned, then all others are valid or else are only voidable. The same course of argument would lead to the conclusion that because in the ninth and eleventh clauses of the section on causes for divorce there are stated grounds which relate to annulments, and in fact are strictly annulment grounds, then all other causes for annulment are excluded from the law in this state, and do not exist, the contrary of which has already been shown by the references to our own well established cases. Of course, what the statutes meant in pronouncing certain marriages void was, by express prohibition, to make those marriages, so mentioned, incapable of ratification or consummation, void whatever might subsequently happen and regardless of what the parties and all others might do in recognition of the illegal status.

Authorities in support of the views sought to be maintained in this dissenting opinion could be multiplied and piled upon each other case by case, but the limits properly allowable to a dissent will not permit. Therefore, only the further space will be taken to cite the following sections of the acknowledged leading and universally recognized authority on the subject, 1 Bishop, Mar. &

D., sections 90a to 95, 105, 115, 121, 125, 127, 135, 136, 138; to call attention to and adopt the summary as stated in Smoot on Insanity, section 407, and to cite and briefly quote from the leading case of Orchardson v. Cofield, 171 Ill. 14, 49 N. E. 197, 205, 40 L. R. A. 256, 63 Am. St. Rep. 211, where, in a proceeding devisavit vel non, the heirs were permitted to prevail against a marriage of an insane decedent, and wherein the court, commenting on and citing the authorities, held a marriage null and void on the grounds of mental incapacity on the part of the man and fraudulent procurement on the part of the woman, and wherein the court closed with these words: ''No one will suffer by the decree below, unless it be the wrongdoer himself. No right or interest of society demands that such a marriage should be upheld.''

There was one concession made in the conclusion of the Ellis case, however, that was clear, that conclusion being that a purported marriage to an absent person would be void; and it may be assumed that it would also have at once conceded that a marriage to a person already dead would be void. In the language of the court in Jenkins v. Jenkins, 2 Dana (Ky.), 102, 104, 26 Am. Dec. 437, a marriage to a corporal and mental imbecile is no more in substance than if to a dead body, and as said in Guthery v. Bell, 206 Mo. App. 570, 576, 228 S. W. 887, in such a case, the victim may as well have been away in some foreign country, ignorant of the alleged ceremony. In respect to the substance essential to a marriage, and so far as the incompetent party is concerned, there is no difference between a marriage to a corporal and mental imbecile—one utterly and hopelessly so—as compared to a marriage with one absent or dead. So far as the fundamental requisites of such a contract is concerned, the victim as to his part is both dead and absent; and the rote of a formal ceremony would be no more potent to supply the essentials of capacity and consent, than could any human act or utterance make present the

absent or revive the dead. It is an elemental and universal principle in equitable law that no mere form, whatever its nature, can ever prevail when all the actual substance is wanting—equity regards substance, not form. And this rule has the aid in this case of that other great principle of equity which is that equity will relieve against every species of actual fraud, and both of these have the aid here of that universal principle both of law and of equity that no person can gain a right by his or her own active and conscious wrong. These three, combined in strength in this case, would seem to be, as they ought to be, absolutely insurmountable.

The Ellis case, therefore, does not measure out on the yardstick of the law, and, when applied to a case like this, is grossly offensive to justice. There is no contention by the majority that it is not in fact unjust, and offensive to justice; but decision is planted upon the proposition that the statutes have been re-enacted since the Smith case, supra, and that the interpretation there put upon said divorce statute has become a part of the statutes. It has already been shown that no such construction was within the facts of the Smith case or within the province of decision in that case, and that indeed no such construction was therein attempted. The first construction which carries the statute to the extent relied on by the majority was in this Ellis case, and there has been only one re-enactment of the statutes since that time, namely, the Code of 1930. But when the Code of 1930 was adopted the very question which we have now before us in this case was expressly reserved and withheld from decision in White v. Williams, 154 Miss. at page 903, 124 So. 64, this decision being of date October 14, 1929. Consequently, the court cannot rest behind the claim of legislative immunity; wherefore, instead of such claim and instead of excusing and apologizing for the said Ellis case, the court ought to limit its application and in the main overrule it. The sound rule in the latter respect, as announced

in Brewer v. Browning, 115 Miss. 358, 398, 76 So. 267, 519, 520, L. R. A. 1918F, 1185, Ann. Cas. 1918B, 1013, should be followed. There this court said: "Courts are created, maintained, and sworn to administer justice and not to adhere strictly to arbitrary rules. . . . We refuse to crucify justice on the cross of precedent."