WILLIAM SMITH *v.* MOLLIE SMITH.

1. INSANITY AS A CAUSE OF DIVORCE.—Prior to the code of 1857, the subject of divorce for insanity of either party was dealt with as at common law.  Ward v. Dulaney, 23 Miss. 414.  At common law, marriage with an insane person was a nullity, because of inability to assent.

2. SAME—MISSISSIPPI STATUTES.—By our statutes, (code of 1857, 334, chap. XL. sec. IV. art. 15 ; code of 1871, § 1770), neither insanity nor idiocy of either party at the time of the marriage was a sufficient ground for divorce ; but in addition thereto, the other party must have been at the time of the marriage ignorant of such disability.  This, and the provision that the issue of such marriage shall not thereby be bastardized, are the only changes our statute makes in the rule at common law.

3. INSANITY AS IT AFFECTS THE CONTRACT OF MARRIAGE—CASE AT BAR.—Occasional spells of insanity before marriage and ultimate permanent insanity several years afterwards, together with evidence of hereditary taint in the family of the defendant, do not warrant a divorce.

APPEAL from the chancery court of Lowndes county. LYON, Chancellor.

Appellant filed his bill in the chancery court of Lowndes county, on the 25th day of March, 1868, praying for a divorce, *a vinculo matrimonii,* from the appellee, and alleged as grounds for such divorce, in substance, the following facts :

That complainant first became acquainted with defendant in the month of June, 1865.  That in the month of December, 1865, subsequent to their marriage, he discovered for the first time that she was the victim of hereditary insanity.  Sixteen months after marriage she gave birth to a child, which is now dead, but

which in life exhibited evidences of insanity. Complainant having children of a tender age by a former wife, and being satisfied that the insanity of the defendant could not be removed, ceased to live with her in the month of February, 1868. The defendant is charged with being insane not only at the time of marriage, but from childhood. The bill concludes with the usual prayer, and is sworn to in the usual manner.

On the 4th of August, interrogatories to prove the allegations of the bill were filed in the clerk's office, and due notice thereof given. On the 12th of November, 1870, a guardian *ad litem* for the defendant was appointed, and the cause remanded to rules for the further taking of testimony. At the April term, the guardian *ad litem* made the usual formal answer, whereupon the court denied the prayer of complainant and dismissed the bill, from which decree the complainant prosecutes this appeal.

The evidence developed by the interrogatories is in substance as follows : (All the witnesses having been summoned by the complainant.)

S. J. Johns : Is the brother-in-law of defendant, having married one of her sisters. That of his own knowledge he did not know the defendant to have been *non compos mentis,* or insane before marriage, but such was her family history. Her brother has for a great many years been deranged, and is now in the asylum at Jackson. The family history as to her derangement was kept a profound secret before her marriage, lest it might interfere with her matrimonial prospects.

Dr. W. L. Lipscomb testified that he is a practising physician of twenty years' standing. Became acquainted with defendant after her marriage, and in the discharge of professional duties. He attended her at various times during a nine month's pregnancy, and for some months thereafter. During all that time, she had repeated attacks of insanity, and was insane up to the

time of his last acquaintance. The first time he saw her, he suspected that she had previous similar attacks, and had inquiries instituted to ascertain the truth, of which complainant was ignorant, and denied the fact, but subsequent investigations by him, induced him to believe it was true.

Mrs. A. T. Jackson testified that about three months after the marriage of complainant and defendant in the year 1865, she saw Mrs. Smith, and she was deranged. She did not know her before marriage, but saw her for the first time five or six days after marriage, and at once saw she was deranged. She frequently saw her afterwards, and she was in the same deranged condition. Witness testified to a conversation of Mrs. Allen, the grandmother, wherein she stated that Mrs. Smith prior to her marriage, was subject to mental aberration and derangement. During a lucid interval of Mrs. Smith's, she stated to deponent that prior to her marriage, she had spells of derangement, and regretted that Mr. Smith was ignorant of the fact. That her brother, John, was deranged, and that during the courtship, her mother had sent him away from home to prevent Mr. Smith from seeing him. She stated to deponent that it was through the influence and persuasion of her mother that complainant had not been apprised of her condition and married her in ignorance of the same. Her sister, Mrs. Pearson, had also been similarly affected. At times, Mrs. Smith was lucid and clear in mind, and at once relapse into derangement. After the birth of her child, she told witness that she intended to kill it on the first opportunity, and frequently asked her for laudanum with which to effect its death. She had been known to throw the child down in a violent and cruel manner, and would require to be restrained in order to save its life. During the first twelve or eighteen months of deponent's acquaintance with defendant, she

had all the appearances of a maniac, and during the last nine months was an idiot.

John C. Hall testified that he became acquainted with Mrs. Smith soon after her marriage. Her deportment indicated derangement. Her conversation was wild and incoherent, and she would give away the clothes and provisions of the family, in a profuse manner, (the complainant being a mechanic and in limited circumstances,) and do other acts indicative of a deranged mind. There were lucid intervals of defendant's mind when nothing appeared wrong by which any derangement could be detected. Witness was at the time occupying the same house with Mrs. Smith, and saw her daily.

Matt. Harris testified that the defendant was deranged when he first knew her, prior to, at the time of her marriage with complainant and subsequent thereto. Defendant had lucid intervals, when one not intimately acquainted could not discover any evidence of mental disorder. Deponent testifies as to the derangement of defendant's brother and sister, alluded to by the foregoing witnesses.

Several other witnesses testified to acts indicative of insanity in the defendant similar to those mentioned in the foregoing testimony.

*Humphries & Sykes* for appellant,

Insisted that under the state of case as appears upon the face of the bill, and the testimony of the witness establishing the fact of the insanity of the defendant, the court should have granted a divorce *a vinculo matrimonii*.

The depositions, although they have not the dignity or force of the testimony of medical experts, must be received in establishing the disordered mental condition of defendant. Whart. & Stille, Med. Jur. 78; Clarey v. Clarey, 2 Ired. 78; Clark v. the State, 12 Ohio, 483; Grant v. Thompson, 4 Conn. 403; Moore v. Crawford,

7 Vt. 499; Gibson v. Gibson, 9 ib. 229; Calven v. Halser, 7 Barb. 374; Baldwin v. the State, 12 Mo. 223; Dewitt v. Berley, 12 Barb. 550; Kinn v. Kinn, 9 Conn. 102; Norris v. the State, 16 Ala. 776; Bishop on Marriage and Divorce, § 185; Ray. Med. Jur. (2d ed.) § 200.

No counsel for defendant in error.

SIMRALL, J.:

The appellant sued for a divorce " *a vinculo matrimonii,*" on the ground that his wife, before and at the time of the marriage, was insane. He avers that her mental infirmity was at that time unknown to him, but that it disclosed itself shortly after the marriage; that, conceiving that it was temporary and curable, he continued to cohabit with her, until satisfied that she was incurable, when he separated from her. As to Mrs. Smith, the wife, the case was prepared and heard *ex parte* in the chancery court. There is no appearance for her in this court.

In none of the revisions of the statutes, prior to 1857, was insanity mentioned as one of the causes of divorce. Prior to that time the subject was dealt with as at common law. That code made insanity cause of absolute divorce, " if the other party was insane at the time of the marriage, and the party applying did not know of such insanity." It is a principle common to the law of contracts, quite as applicable to marriage, as to those which are purely private, and terminate, in their influences and effects, with the immediate parties thereto, that if either party was deficient in intellect, so as not to have the power of will and assent, as to such person, the contract was of no effect. Therefore, the common law denounced a marriage with an insane person as void, because of inability to assent thereto. The case of Ward v. Dulaney, 23 Miss. 414, arose prior to the revision of 1857, and was decided under the common law. It were

quite impossible to lay down a general rule, to measure with precision the degree of mental imbecility or intellectual alienation, which will suffice to annul the marriage contract. It may be safe to say that there ought to be enough of capacity to comprehend the subject, and the duties and responsibilities of the new relation. 23 Miss. Rep. *supra.* The statute makes two modifications of the common law : first, insanity at the time of marriage, does not make void the matrimonial contract, but in addition thereto the party applying must not know of its existence; second, upon dissolution, the issue shall not be bastardized. The statute meant to deny a divorce when the applicant for it was aware of the insanity at the time of the marriage, and then also to make legitimate the issue of the marriage, although it might be dissolved. This we suppose to be the extent of the change made of the common law. The statute, like the old law, referred the insanity " to the time of the marriage."

There must, from the reason and fitness of things, be the presumption that all persons of competent age have sufficient intellect and understanding to make a contract, or be bound by, and responsible for, an act done. Experience and observation teach that intellectual competency is the rule, the want of it the exception. Powell v. Powell, 27 Miss. 783.

The law, deriving the principle from common experience and observation, recognizes as true, that the same person may at one time, because of mental derangement, be irresponsible, and at another, be in such full possession of the mental faculties as to comprehend the quality of the act, and the responsibilities that flow from it.

The courts accept as true, that the general term mania, implies many phases of mental disorder; in other words, there are degrees of insanity. There may be a partial impairment of the faculties, or there may

be an utter want of power to apprehend the quality and relations of some subjects, whilst upon others the mental operations may be clear, normal and rational. In the more aggravated forms, there is an utter prostration of the intellect. The faculty of perception, the understanding, may be healthy and vigorous upon most subjects, whilst upon one or more, the quality and its relations may be entirely confounded and perverted. It is also accepted in jurisprudence, that mental distempers may be periodic; that whilst the disorder, or its paroxysm, lasts, there may be neither reason, will, nor understanding to give responsibility to the conduct. But when this state subsides, the mind returns to a normal and healthy action. This constitutes what is called the "lucid interval."

It is of the utmost importance in legal investigations, to keep before the mind distinctly the character of mental derangement in the special case; otherwise, wrong deductions may be made. Presumptions of fact are upon the results of experience and observation. If proof establishes the condition of complete, permanent insanity before the contract made, or act done, the presumption would be that the same condition continued; and the party averring the validity of the act or contract, must show that, "at the time," that condition had passed away, and has been succeeded by a lucid interval. 1 Hagg. Ec. Rep. 414; 1 Eng. Ec. Rep. 44; Way & Way, 33 Ala. 187; same case, 19 ib. 524.

But if the insanity be temporary, arising out of some exciting cause, such as a disease of the body, or one of its organs, as a *suppressio mensis*, or engorgement of the vagina, which, when they subside, leave the mind clear and lucid, it would seem that the "*onus*" should be upon the party impugning the contract, or the act, to show that insanity existed at the "time in question." White v. Wilson, 13 Ves. 87; Avery v. Hill, 2 Eng. Ec. Rep. 269; 3 Mod. 67; Corlit v. Smith, 7 Iowa, 60. The

distinction we have been attempting to enforce, was emphatically noted in Hix v. Whittiman, 4 Met. 546.

The complainant claims, that inasmuch as he has proved insanity before the marriage he is entitled to the benefit of the presumption of its continuance and existence at the time of the marriage. It becomes necessary, therefore, to ascertain the nature and extent of the insanity; does the testimony establish permanent derangement, or fits, or spells, (to use the common phrase,) followed by lucid intervals; and what was the intensity and duration, of the deranged, compared with the lucid periods.

The acquaintance of the complainant with the defendant began in the early spring of 1865, the marriage took place in December of that year. It is strange if habitual or permanent insanity existed; that in the intimacy of association, which we may suppose existed, during those interesting months, when mere acquaintance passed into friendship, and warmed into love, there was no speech, or act of the defendant, so eccentric and unusual as to attract his attention, or excite suspicion. It was said by the supreme court of Massachusetts in an anonymous case in 4 Pick. 32, that "going through the marriage ceremony with propriety and decorum" was of itself *prima facie* evidence of sufficient understanding of the contract, to make it valid. We would not be disposed to attach such grave consequences to that circumstance. We prefer the estimate put upon it by Lord Stowell, in Browning v. Reane, 1 Eq. Ec. Rep. 190. Much stress was not to be laid on that circumstance "as persons in that condition, will nevertheless often pursue a purpose with the composure and regularity of apparently sound minds."

The testimony comes short of showing that the defendant was, before her marriage, "habitually" insane. Most of the witnesses on this point speak from report. After marriage, she passed several months at a time in

a calm, quiet, composed state of mind, conversing and behaving rationally. Whilst in this condition, she expressed regret to one or two of her friends, that her mother had not disclosed her condition to Mr. Smith before their marriage,—that she urged her to do so. It was in evidence, that the insane taint was in her family; her sister (who was married) was affected, as she was, her brother was so likewise. Dr. Lipscomb, who attended her after marriage, and especially during pregnancy, attributed her mental disturbance, to a disease peculiar to her sex, and supposed that it had produced the like mental effects before she was married. Mr. Smith, the husband, denied that she had been in that condition, but on inquiry was satisfied of its truth. It is hard to believe, (unless convinced by testimony,) that the mother would have permitted the marriage, if she believed that her daughter was habitually insane, or incurably so. She may have supposed that marriage, and time would bring about a cure. Instead of a realization of this hope, very shortly after marriage, the attacks became more severe, which coupled with the hereditary tendency to derangement, this unfortunate wife became confirmed in her affliction. We have not seen a case where the presence of the taint of hereditary insanity, with manifestations of occasional paroxysms, has of itself been held to be cause of dissolving the marriage. The case of Hamaker v. Hamaker, 18 Ill. 149, is, in many of its features, like this, (including the hereditary predisposition,) yet the divorce was denied. See, also, Achey v. Stephens, 8 Ind. Rep. 411.

The complainant's case then, is in this catagory: he has not shown by his testimony, that at any time before the marriage, or shortly before it, the defendant was insane "habitually;" that such was her "confirmed" condition. The duty was upon him to make proof then, that she was insane at the "time of the marriage;" no such testimony was offered. Not establishing enough in

her previous history to entitle him to the presumption which he claims, he has failed to show title to the relief which he sought.

We concur in the conclusion of the chancellor, and affirm his decree.