WHITE *v.* WILLIAMS *et al.*

(Division B. Oct. 14, 1929.)

[124 So. 64. No. 28011.]

*Ruth Campbell,* of Yazoo City, for appellant.

*Barbour & Henry,* of Yazoo City, for appellees.

ANDERSON, J., delivered the opinion of the court.

Appellees filed their bill against appellant in the chancery court of Yazoo county, under sections 2790, 2791, Code of 1906 (Hemingway's Code 1927, sections 325, 326), to have themselves declared the sole heirs at law of Clem White, deceased, and to that end have set aside and annulled, so far as they are concerned, the marriage of appellant and deceased, and to have appellant removed as administratrix of the estate of the deceased. Appellant demurred to the bill, which demurrer was by the court overruled. From the decree overruling the demurrer, appellant was granted an appeal

to settle the principles of the cause. The bill, leaving off the formal part and the prayer, follows:

"Petitioners, Jack Williams, a citizen and resident of Washington county, Mississippi, and Indinan Demby, a citizen and resident of Perry county, Alabama, and Lee Oames and Annie Holmes, citizens and residents of Bolivar county, Mississippi, and Lou Anger, a citizen and resident of Leflore county, Mississippi, would respectfully show unto the court that they are respectively brother and sister, and nephew and nieces of Clem White, and his sole legal heirs and next of kin, the said Clem White having died November 17, 1927, intestate, in Yazoo county, Mississippi, his fixed place of residence, leaving certain real estate and personal property in said county; that one Sophie Jones White, claiming to be the wife of Clem White, deceased, qualified as administratrix of his estate, but that her marriage to the said Clem White was not a legal marriage, because the same was contracted just four weeks before the death of the said Clem White, at a time when he was *non compos mentis*, and incapable of entering into any contract, at a time when he was suffering from pellagra of the brain, and in no physical or mental condition to understand the nature of the supposed marriage contract he was entering into, or to give his consent thereto, the said Sophie Jones, at the time and for some time prior thereto, having been fully advised of said condition of lunacy with which said Clem White was afflicted, and not having entered into the relationship of marriage innocently or in good faith, her sole purpose in marrying the said Clem White having been to inherit his property as his widow and sole heir. In furtherance of her fraudulent purpose to become owner of his property, said Sophie Jones made all the arrangements for said marriage and the procurement of the license and minister, and married him knowing that his mental condition was such that he was incapable of legally consenting to a valid marriage, and knowing

that he was suffering from an incurable mental disease, pellagra of the brain, which would soon cause his death, as a result of which disease the said Clem White did, in fact, die in four weeks after said illegal marriage, without ever having recovered his sanity.''

The chancellor held that, although under the allegations of the bill appellees had no right under the law to have the marriage of the appellant and Clem White, the deceased, annulled as between them, nevertheless the bill made a case in which appellees were entitled to have the marriage annulled in so far as it affected their heirship to the estate left by the deceased.

The bill does not aver that after the marriage appellant and deceased lived together and recognized each other as man and wife. Applying the well-established principle that a pleading is to be taken most strongly against the pleader, the bill should be considered as admitting those facts.

We are of opinion that *Ellis* v. *Ellis*, 152 Miss. 836, 119 So. 304, is controlling of the question involved. It was held in that case that the insanity of one of the spouses at the time of the marriage did not render the marriage void, but voidable only, and that such a marriage was valid for all purposes, and could not be annulled or attacked collaterally, but only in a direct proceeding during the lifetime of the parties. The attack on the marriage was made in that case by those who would have been the sole heirs at law of the deceased, except for the marriage which was attacked. That is true, also, of the present case. We are unable to distinguish on principle the present case from the Ellis case. It must be admitted that, under the principles laid down in the Ellis case, fraudulent marriages with insane persons may take place, resulting, on the death of the insane, defrauded spouse, in his or her estate being diverted from its rightful course of descent and distribution. On the other hand, if would-be heirs were permitted, after the

death of the insane defrauded spouse, to attack the marriage in order to inherit the estate of such deceased spouse, we think the gates of fraud would be opened still wider. The incentive to perjury would be great in many cases, especially where there was no issue of the marriage, and the marriage had taken place against the wishes of those attacking it. It is often an elusive question whether a person is sane or insane, and the extent of the insanity, if any, whether or not the person is so unbalanced mentally as to be incapable of understanding the nature of the act being inquired into. Alienists of high standing and great learning often differ on this question. In many cases, the testimony of the person himself, alleged to be insane, has a material bearing on the question; if his mouth is closed by death, material evidence cannot be had. Where one of the parties to a marriage is incapable of entering into the marriage state because of insanity, and the other party, knowing of such insanity, fraudulently induces and brings about the marriage, in order to inherit the estate of the insane spouse in case the latter should die first, any member of the family of the insane spouse sufficiently interested could have a guardian appointed, and by a proper proceeding in court through such guardian have the marriage annulled in the lifetime of the parties. In other words, the defrauded insane spouse, during the lifetime of the parties to the marriage, could enforce his rights in the courts.

It follows from these views that on the death of the deceased, Clem White, the question of the legality of his marriage to appellant was forever foreclosed, so far as appellees were concerned; that the marriage was not only legal as between the parties during their lifetime, not having been annulled while they were both living, but legal as against any right of heirship on the part of appellees. We think much less harm will come from this

rule than from the contrary rule sought to be maintained by appellees.

We are not, however, now passing on a case where the three following elements are conjointly present: Where (1) the insane person was wholly *non compos mentis* at the time of the pretended marriage, and this condition was known beyond doubt to the other party, and (2) so knowing the other party procured the marriage for the sole purpose of fraud, and went through the formal ceremony of marriage as an iniquitous pretense only, and (3) there was no sort of consummation of the pretended marriage by the living together of the parties, even to the extent of an ostensible assumption of the relations of the marital estate. What we would hold, on that conjoint state of facts is not herein determined.

*Reversed and remanded.*