PARKINSON v. MILLS.

(Division A. March 4, 1935.)

[159 So. 651. No. 31139.]

786

F. W. Elmer, Jr., of Biloxi, and Gex & Gex, of Bay St. Louis, for appellant.

788

W. H. & Robt. H. Powell, of Canton, for appellee.

792

Argued orally by **W. J. Gex, Sr.**, for appellant, and by **W. H. Powell** and **Robert H. Powell**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

Mrs. Emma P. Mills, guardian of William E. Parkinson, non compos mentis, filed this bill in the chancery court of Madison county, Mississippi, against Mrs. Eleanor Wilson Seay Parkinson, praying for an annulment of a marriage existing between William E. Parkinson and the appellant. Appellant appeared in that court and moved to dismiss for want of jurisdiction in that county, and averred that the marriage status existed and that she lived in Harrison county. She prayed either

that the bill be dismissed, or that the cause be transferred to Harrison county. Upon the hearing of the motion the court ordered the cause transferred, which was accordingly done. Mrs. Parkinson appeared in the chancery court of Harrison county, filed a demurrer to the bill, which was overruled, and then filed answer, and upon the pleadings and proof the court annulled the marriage.

The gravamen of the bill was to the effect that a marriage ceremony had been fraudulently procured by appellant with the non compos mentis in order to obtain an interest in his estate, and that the non compos mentis was hopelessly and permanently insane, and incapable of entering into a marriage or any contract because of such mental disability. It charged that appellant had knowingly married him at a time when he was confined in the United States Veterans' Hospital at Gulfport, Mississippi.

The answer of appellant denied that Parkinson was mentally incapacitated or that he was insane, and denied that she procured the marriage ceremony with him in order to obtain possession of his property.

Before the trial of the case the appellant made a motion for an allowance of attorney fees pendente lite, and alleged that she was without means with which to pay her attorney, and that her husband was worth thirty thousand dollars.

We shall state such facts as we deem necessary to a proper understanding of the case. Parkinson was born in New York City and had lived for the greater part of his life with his aunt, Mrs. Emma P. Mills, who filed this suit. He had been a fairly successful business man as an insurance broker. He was a veteran of the World War. His mother had been an inmate of a hospital for the insane either in Connecticut or New York for

thirty years. In 1927, Parkinson was engaged to a young woman in New York, and just before the proposed marriage the engagement was broken. According to the evidence of Mrs. Mills and Parkinson's brother, his mind became impaired; he had delusions and became a changed man; he lost his business, and had an exalted idea of himself and his business; he became excited without provocation and would make scenes in public places. His aunt had carried him to various places for change of scenery. Finally, in 1930, she sent him to a plantation which he and his brother owned near Flora, in Madison county, Mississippi, and placed him with the lessee of the plantation. His mental condition became such that while on this visit Howard, the lessee of the plantation, carried him to the United States Veterans' Hospital at Gulfport on February 6, 1930. On April 12, 1930, he was adjudged a lunatic by statutory proceedings before the chancery clerk of Harrison county and a jury of six men, and was committed to the care of the Veterans' Hospital, and it was adjudged that a guardian should be appointed for him.

It is not shown that he had any residence in Harrison county, or any property therein. On September 24, 1930, Mrs. Mills was appointed his guardian by the chancery court of Madison county, where he had money in bank and considerable real estate.

Appellant first met Parkinson in the city of Biloxi about May, 1932. He was confined in the hospital, but because he was considered harmless he was allowed a furlough or pass on week-ends which permitted him to be in the cities of Biloxi and Gulfport part of Saturday and Sunday. Appellant was introduced to Parkinson by Mrs. Clark, meeting him on the street. He visited her on the occasions of this week-end furloughs until they were married on August 7, 1932, at the home of a Presbyterian minister. They lived together as husband and

wife on the occasions of one or two week-end furloughs. When the authorities of the hospital discovered that he had married, they confined him to the ward and canceled the privilege of furloughs to him.

The evidence of two physicians is to the effect that the non compos mentis had suffered from hebephrenia dementia præcox since the time he had been in the care of the hospital and under its immediate supervision and observation; they agreed that he would never be mentally competent to make contracts or engage in business, and that he was not mentally capable of undertaking a contract of marriage or anything else; that in their judgment he was habitually and permanently insane, and that there was no hope for his improvement. The lay witnesses offered by the appellee testified to various circumstances which they claimed showed he was not capable of appreciating the nature and responsibility of marriage or any contract, and that in their opinion he was insane.

Appellant testified that Parkinson had never had delusions, or exhibited any evidence of insanity while she was with him; that she loved him dearly; and that she did not know that he was an inmate of the Veterans' Hospital, and was surprised when on Sunday night after their marriage he told her that he would have to return to the hospital. She disclaimed any knowledge of his property or that he had told her anything with reference thereto. She denied that she had any mercenary designs in bringing about the marriage. She admitted that she had been married first to Wilson, who had been an officer overseas. It is quite clear from her testimony that she did not know whether or not she had ever been divorced from Wilson. Later she had married Seay, and he had secured a divorce from her on the ground of habitual cruel and inhuman treatment about a year or two before this marriage to Parkinson. The license was issued to her as Mrs. Wilson.

The record shows that she telephoned the clerk to have him remain in his office Sunday morning to issue the license; that she went to see the Reverend Archie Smith and arranged with him to perform the marriage ceremony. She had visited Mr. Steward, a furniture dealer, and Miss Rushing and asked them to be witnesses to the marriage. Parkinson was on furlough Sunday morning, and he and appellant, in company with the two witnesses, drove to the clerk's office, and appellant requested the license. On that occasion Parkinson immediately began a conversation about his possessions and business. They went to the minister's house, where they were married. They drove around awhile in company with the witnesses, and these witnesses testified that they saw nothing abnormal or unusual in Parkinson's conduct or conversation during the two or more hours they were together. The minister and his wife did not notice anything unusual about him. Letters written by Parkinson to appellant were offered in evidence, and there is nothing in the letters out of the ordinary.

Many inconsistencies and contradictions are to be found in appellant's evidence, which her counsel now excuse because of the alleged manner of opposing counsel in conducting the cross-examination. Her manner and that of counsel were all before the chancellor.

First. On the facts of the case we are convinced that the chancellor correctly found that Parkinson was mentally incapable of assuming the marital relation, and that his incapacity is continuing and permanent. He was further justified in finding that appellant married the non compos mentis with knowledge of the fact that he was an inmate of the institution for treatment for that disease. She says she did not know of his property and of his boasting and his delusions on that line, yet upon his first meeting with Mrs. Clark, who introduced her to him, and with Mr. Ramsey, the clerk who issued the

license, Parkinson immediately began to tell them of his private affairs in a boasting way. For a long time appellant lived in a house adjoining the Veterans' Hospital with only a fence between, and she told the court that she thought Parkinson was an employee of the institution rather than an inmate, overlooking the fact that she had sworn in her answer that he had told her that he was in the hospital for treatment. She had requested Mrs. Clark to call her by a name different from either Seay or Wilson. She deceived the minister in order to bring about the marriage. She represented to him that the priest of her church, the Roman Catholic, would not perform the ceremony because she was going to marry a Protestant, and the truth is that she was a divorcee. Her evidence shows that she does not know now whether she was ever divorced from her first husband, or whether he is living or dead. Appellant wrote appellee on September 18, 1932, that Parkinson "had a chance to come back," referring to his condition. She set about to get control of his property within a short time after the performance of this marriage ceremony, and on the whole the chancellor was entirely warranted in refusing to believe her evidence.

The applicable principle of law is that it is presumed that all persons of competent age have sufficient intelligence and understanding to make a contract. If the proof establishes a condition of complete and permanent insanity before the contract is made, or the act done, the presumption is that the same condition continued, and the party averring the validity of the act or contract must show that at the time that condition had passed away and had been succeeded by a lucid interval. Smith v. Smith, 47 Miss. 211. Here the evidence is that the insanity is incurable, continuing, and ever present. The fact that witnesses at the time of the marriage observed no abnormal or unusual condition is not

of much weight under all the facts of this case. Smith v. Smith, supra. We cannot reverse the chancellor on the facts.

Second. It is insisted that the appointment of Mrs. Mills as guardian by the chancery court of Madison county is a nullity. This point was not raised in the lower court, and her right to sue in that capacity was not challenged, nor was there any evidence taken in order that it might be determined whether or not there was any irregularity in the appointment of the guardian. We will not consider the point, because it is presented for the first time here. Mitchell v. Finley, 161 Miss. 527, 137 So. 330.

Third. It is next urged that this case should be reversed because the suit was brought by Mrs. Emma P. Mills, guardian of William E. Parkinson, instead of having been brought by William E. Parkinson, by Emma P. Mills, guardian. The first and complete answer to this ground, argued for reversal, is that this question was not raised in any manner in the lower court. Mitchell v. Finley, supra. Of course, the bill should have been properly brought by the non compos mentis by his next friend or guardian. However, if objection had been made an amendment would have been promptly made and the point in the case would have amounted to nothing. In an annulment proceeding because of insanity, the insane party is a proper and necessary party. An objection raised for the first time in this court comes too late. Griffith's Chancery Practice, section 149. The objection should have been by a special demurrer, raising the question of misjoinder or nonjoinder of parties; the general demurrer on the ground that there was no equity on the face of the bill did not raise this question. We will not now disturb the decree of the court for this reason.

In the case of Ætna Indemnity Co. v. State ex rel. Gillaspy, 101 Miss. 703, 57 So. 980, 983, 39 L. R. A. (N. S.) 961, a suit was brought in the name of a minor by a

person as guardian ad litem, and, there being no guardian ad litem, this court said: "When the record shows that a person instituting a suit is in reality acting as the 'next friend' of the minor, this court will not look with critical eyes on the characterization which the next friend chooses to give himself in the pleadings. We shall treat him as in truth what he is, the friend of the minor."

Fourth. It is next insisted that the chancery court no longer has the power to annul a marriage on the ground of insanity in a suit brought for that purpose on behalf of the insane spouse, and that such has been the law in this state for many years, the changed law, having first appeared in the Revised Code of 1857, chap. 40, art. 15 (Rev. Code 1880, sec. 1157), in which it was provided that insanity is a cause for absolute divorce if one party was insane at the time of the marriage and the party applying for divorce did not know of such insanity. This section now appears as section 1414, Code 1930, the eighth ground for divorce: "Insanity or idiocy at the time of the marriage, if the party complaining did not know of such infirmity."

In the case of Smith v. Smith, supra, after stating the change the court said: "Therefore, the common law denounced a marriage with an insane person as void, because of inability to assent thereto. The case of Ward v. Dulaney, 23 Miss. [410] 414, arose prior to the revision of 1857, and was decided under the common law. It were quite impossible to lay down a general rule, to measure with precision the degree of mental imbecility or intellectual alienation, which will suffice to annul the marriage contract. It may be safe to say that there ought to be enough of capacity to comprehend the subject, and the duties and responsibilities of the new relation. (Ward v. Dulaney), 23 Miss. (414), supra. The statute makes two modifications of the common law: First, insanity at the time of marriage, does not make void

the matrimonial contract, but in addition thereto the party applying must not know of its existence; second, upon dissolution, the issue shall not be bastardized. The statute meant to deny a divorce when the applicant for it was aware of the insanity at the time of the marriage, and then also to make legitimate the issue of the marriage, although it might be dissolved. This we suppose to be the extent of the change made of the common law. The statute, like the old law, referred the insanity 'to the time of the marriage.' "

In Ellis v. Ellis, 152 Miss. 836, 119 So. 304, 305, a case for annulment of a marriage was presented to this court. The suit was instituted by Ellis, the surviving brother of George Ellis, deceased, who in his lifetime had married Lottie Simmons. Ellis alleged that the marriage was void ab initio for the reason that the deceased was insane at the date of said marriage, and but for the marriage the complaining party would have inherited the property of decedent. This language appears in the opinion: "Since the adoption of the Code of 1857 neither insanity nor idiocy, at the time of the marriage, has been a ground for divorce in this state, unless the party complaining did not know of such infirmity." The court then set out the statutes which make void certain marriages within prohibitive degrees and between certain races, and held that all other marriages in this state would be classed as voidable and covered by this paragraph. The court further held that no suit could be filed to annul such marriage, on the ground of insanity, after the death of the insane party. In other words, that because of the statute a marriage between an insane party and another, or between two insane persons, was not void, but voidable only.

In White v. Williams, 154 Miss. 897, 124 So. 64, this court held that a marriage, not having been annulled during the lifetime of the husband on the ground that he

was insane at the time of such marriage, was legal as against any right of heirship claimed on behalf of the deceased's husband's relatives, since the insanity of one spouse did not render the marriage void, but voidable only, and that the marriage could not be attacked collaterally. That case was decided upon demurrer. Subsequently, the case was again appealed here and considered by the court in banc, and the court again held that the common-law rule denouncing a marriage with an insane person as void because of inability to assent thereto had been modified by our divorce statute, and that such a marriage was not void, but voidable, and that the right to annul it was barred by the death of the insane party. 159 Miss. 732, 132 So. 573, 575, 76 A. L. R. 757. In that case the court quoted from the former opinion, 154 Miss. 897, 124 So. 64, as follows: "It must be admitted that, under the principles laid down in the Ellis case, fraudulent marriages with insane persons may take place, resulting, on the death of the insane, defrauded spouse, in his or her estate being diverted from its rightful course of descent and distribution. On the other hand, if would-be heirs were permitted, after the death of the insane defrauded spouse, to attack the marriage in order to inherit the estate of such deceased spouse, we think the gates of fraud would be opened still wider. The incentive to perjury would be great in many cases, especially where there was no issue of the marriage, and the marriage had taken place against the wishes of those attacking it. It is often an illusive question whether a person is sane or insane, and the extent of the insanity, if any, whether or not the person is so unbalanced mentally as to be incapable of understanding the nature of the act being inquired into. Alienists of high standing and great learning often differ on this question. In many cases, the testimony of the person himself, alleged to be insane, has a material bearing on

the question; if his mouth is closed by death, material evidence cannot be had. Where one of the parties to a marriage is incapable of entering into the marriage state because of insanity, and the other party, knowing of such insanity, fraudulently induces and brings about the marriage, in order to inherit the estate of the insane spouse in case the latter should die first, any member of the family of the insane spouse sufficiently interested could have a guardian appointed, and by a proper proceeding in court through such guardian have the marriage annulled in the lifetime of the parties. In other words, the defrauded insane spouse, during the lifetime of the parties to the marriage, could enforce his rights in the courts.''

The above-quoted principle has been twice pronounced by this court. It is argued by appellant that these pronouncements are obiter dicta. The above statement appears to be in its entirety a construction of subdivision 8 of the divorce statute; we now adopt this statement as a proper construction of the statute. At the common law an equity court had jurisdiction to annul a marriage on the ground of insanity of one of the parties where that party was mentally incapacitated, or did not have enough of capacity to comprehend the subject (marriage), and the duties and responsibilities of the new relation. Smith v. Smith, supra. This divorce statute is in derogation of the common law and is strictly construed. The insane party continuing to be insane would be presumed not to have the mental attribute or faculty to be able to know or not to know that he was insane at the time of his marriage. So the remedy provided by the statute is one designed to permit a divorce to the innocent sane party after a marriage with an insane person, not knowing of such insanity of the other spouse at the time of the marriage. Under the facts of this case, the common-law remedy is still available in the chancery courts of this

state to a party situated as the facts of this record reveal Parkinson to be. The change is that a marriage with an insane person cannot be disregarded by the parties; the marriage is voidable upon proper pleading in a court of competent jurisdiction, and is proceeded with there as other cases in equity. Antoine v. Antoine, 132 Miss. 442, 96 So. 305. The fact that it is voidable instead of being absolutely void renders it necessary and essential that the marriage be set aside by a court; it no longer rests in the volition of the parties. If the insane party should be restored to his reason and find that he had contracted a marriage during the period of his insanity, he still has the remedy to have the courts annul it, provided he acts promptly and seasonably, and if there be children born of such marriage the court can protect their good names from bastardy by entering the decree effective on its date and in futuro. In such cases, however, the court should rigidly enforce the doctrine of ratification or estoppel with care to prevent, as far as possible, any injustice to any party directly affected thereby.

Fifth. It is next insisted that the court should have allowed appellant alimony pendente lite and attorney fees. We think that motion was presented to the court below in theory upon all the pleadings and proof which had then been heard, and that the court properly declined to allow such alimony and fees. In this behalf the chancellor did not abuse the sound discretion invested in him. This wife did not actually live with Parkinson more than five or six days; he never assumed any duty toward her support, he could not, because he was confined in an institution for the care of the insane. Under these circumstances, no allowance was proper. Reed v. Reed, 85 Miss. 126, 37 So. 642; McFarland v. McFarland, 64 Miss. 449, 1 So. 508.

We have not considered authorities from other states for the reason that the solution of this case rested, in our opinion, in our own decisions, and the authorities from other states would only confuse and becloud the question, for the reason that the various statutes, and especially statutes controlling annulment of marriages, would affect the conclusions reached by courts of other jurisdictions.

Affirmed.