TEXACO, INC., A DELAWARE CORPORATION, et al. *v.* J. J. MUSGROVE, N.C.M., JAMES JOSEPH WILSON, GUARDIAN

No. 43540          May 24, 1965          175 So. 2d 490

210

*Welch, Gibbes & Graves, William S. Mullins, III, John W. Kelly,* Laurel, for appellants, Texaco, Inc.

*Boyd, Holifield & Harper,* Laurel, for appellants, E. L. Erickson, et al.

*C. W. Sullivan, R. M. Sullivan, Lester Clark,* Hattiesburg, for appellees.

Gillespie, J.

The guardian of J. J. Musgrove, *non compos mentis*, filed an original bill of complaint in the Chancery Court of Jones County against Texaco, Inc., R. H. Boteler, and others, seeking a decree cancelling (1) a mineral deed executed by J. J. Musgrove to Texaco, Inc., on March 19, 1942, conveying an undivided one-half of the minerals under 40 acres of land situated in Jones County, and (2) an oil, gas and mineral lease executed by J. J. Musgrove to R. H. Boteler on September 25, 1957, covering an undivided one-half interest in and to the oil, gas and other minerals under the aforesaid 40 acres of land.

The basis of the complaint was that Musgrove was mentally incompetent at the time of the execution of said instruments and had been mentally incompetent since about 1930. The answer of the defendants denied all the averments of the bill of complaint with reference to mental incapacity, and after a lengthy trial on the

merits the chancellor entered a decree finding that the mental condition of Musgrove, then 74 years of age, had been deteriorating and gradually getting worse over a period of many years, and he was suffering from a mental disorder described as schizophrenic reaction, paranoid type; and that he did not possess on March 19, 1942, or on September 25, 1957, the mental capacity to understand the nature of the transactions in which he was engaged on those dates, or the effect upon him or his property.

The principal contention of the appellees on this appeal is that the evidence established that J. J. Musgrove had been chronically and habitually insane since 1930 and that this condition is presumed to have continued thereafter, and that there is not sufficient evidence of lucid intervals at the times the two instruments were executed to overcome the presumption of continued insanity. On the other hand the appellants' principal argument is that the lower court erred in finding that Musgrove was chronically and habitually (or completely and permanently) insane prior to or at the time of the execution of the two instruments involved in this case.

The record in this case reflects great skill and industry on the part of counsel for both sides in the preparation and trial of the case. The record is a lengthy one and more than thirty witnesses were examined and numerous documents were introduced. The testimony covers practically the entire life of J. J. Musgrove from his birth about 1890 until the date of the trial. The various dates in our narrative may be subject to some approximation because many of the witnesses were vague as to when J. J. Musgrove lived at this or that place.

In 1908 when Musgrove was about 17 years old he married Lottie Walters. He struck his wife one time and spat in her face once and they separated after living together for about one year. They had one child,

Clara, who married J. E. Wilson, and one of their children is James Joseph Wilson, the present guardian of J. J. Musgrove. Clara Wilson was admitted to Whitfield for treatment of insanity on October 25, 1957. J. J. Musgrove was born in Clarke County, Alabama, and moved with his family to Jones County, Mississippi, when he was a boy. As soon as he was old enough he began work at one of the lumber mills and followed that line of work until sometime in the 1920's. At one time he purchased a home and supported his aged parents for a time thereafter. Later he purchased 76 acres of land in the Oak Grove Community in the vicinity of Ellisville in Jones County. He worked at the Eastman-Gardner Lumber Company and rode a bicycle back and forth to work each day, a distance of about 11 miles. His daughter and her husband and their children were living with Musgrove at Oak Grove until about 1932 when his son-in-law, J. E. Wilson, moved to a farm near Bay Springs in Jasper County and about 1933 Musgrove moved to Bay Springs and lived with his daughter and her family until 1938. While he was living with the Wilsons near Bay Springs he cleared land and did some farming on the Wilson farm and looked after the stock. He had a few head of cattle of his own. Musgrove owned 40 acres of land in the Rustin Community near Sandersville on which there was a crude log cabin consisting mainly of one room with a porch and a stick and mud chimney. He moved there in 1938 after he had some misunderstanding with his daughter and son-in-law. He lived for nearly 15 years in this crude house some distance from the road, during which time he did his own cooking. His daughter and son-in-law visited him from time to time and he visited them and also visited his sister, Mrs. Burnside, near Ellisville from time to time. His log house burned or was otherwise destroyed about the year 1953 and he went to live with his sister, Mrs. Burnside, for a

number of years; he later moved back to the Rustin Community in 1958 and lived with Mr. Ben Williams; and in the fall of 1960 he built a small ten by twenty foot house on his 40 acres of land near the spring where he got water and lived in it until he was committed to Whitfield and adjudged insane on March 17, 1961.

After his separation from his wife about 1912, J. J. Musgrove never showed any further romantic interest in women during the remainder of his life. He never attended school beyond the third grade. The record is conclusive that he worked at some kind of labor practically his entire life, and while he maintained a very low standard of living, he engaged in numerous business transactions involving land and in selling and leasing minerals, and there is no proof that anyone was ever able to take undue advantage of him.

The testimony on behalf of the complainant was given for the most part by relatives. His grandson, J. J. Wilson, his brother, Frank G. Musgrove, his former wife, Mrs. Lottie Dean, his brother-in-law, Walter Burnside, his granddaughter, Ernestine Ford, W. K. Crumpton, who knew Musgrove from 1928 to 1940, S. H. Nixon, who lived near Musgrove for about six years prior to 1931, and Earl Wilson, brother of Musgrove's son-in-law, testified generally concerning Musgrove's activities from about 1925 until he was committed to Whitfield on March 17, 1961. They related that from time to time he claimed to have seen ghosts and talked with them, to have seen non-existent Indians, that he believed there was gold on his land and he dug for buried treasure, and also claimed that spirits dug for gold on his property. They also testified that he firmly believed for many years that there was oil on his 40 acres in the Rustin Community; that he read the Bible a great deal and misinterpreted it; that he ceased to eat meat, milk, butter or eggs because he said the Bible taught it was a sin; that he was suspicious and had no confidence

in anyone; that he could not get along with members of his family; that he had filthy habits and paid no attention to personal cleanliness; that he had a law book which he read and discussed; that he once had snuff in his hair, claiming that it was there to kill the fleas. There was testimony of other similar statements attributed to Musgrove. Five of these witnesses were of the opinion that since 1930 Musgrove had been mentally incapable of understanding business transactions.

His son-in-law testified that he once found Musgrove in a ditch filled with water from a rain with only his face out of the water. The testimony of these witnesses was for the most part of a general nature, and furnishes very little specific information as to the quantity of irrational talk concerning ghosts and the other matters mentioned. Some of them testified concerning statements made by Musgrove prior to 1930 and at various intervals between that time and March 17, 1961, when he was committed to Whitfield.

On or about the evening of March 16, 1961, he went to a neighborhood store at Rustin and bought some food and ate at the store. He did not appear then to be any different from what he had always been and showed no signs of abnormality. Thereafter he went to another store carrying a pistol in his pocket and told the people that some Indians were after his money and he was going to kill them. The neighbor who knew about this became alarmed, tried to get the sheriff, and finally got Mr. Burnside, Musgrove's brother-in-law, to come and take the gun from him, which was accomplished without difficulty. Musgrove was then taken to jail and committed to Whitfield where the diagnosis was schizophrenic reaction, paranoid type. He has since remained in Whitfield.

Dr. Wm. L. Jaquith, Director of the Mississippi State Hospital (Whitfield), and Dr. J. J. Head, Clinical Director at Whitfield, testified concerning the admission

of Musgrove to Whitfield, and the clinical procedures and of the hallucinations and various beliefs that Musgrove had after he entered the hospital, and they considered his case a classic picture of schizophrenic illness, paranoid type.

In answer to a lengthy hypothetical question, which contained a synopsis of the testimony offered by complainant, together with the facts concerning Musgrove's admission to Whitfield and the clinical procedures and diagnosis following his admission in March 1961, Drs. Jaquith and Head were of the opinion that Musgrove had been suffering from schizophrenic type of illness at all times within the last thirty years, or since about 1930, and had not been competent to understand the import of his acts as related to property.

On cross-examination, appellant's attorneys sought to supplement the facts stated in the hypothetical question by including what they expected to prove (and later did prove without dispute) and to ask Drs. Jaquith and Head whether such additional facts would influence their opinion. The court sustained the objection and would not allow appellants to ask a hypothetical question based on proof not then in the record. Both doctors stated that a mentally ill person can be competent and understand transactions at times; that one suffering from schizophrenic illness may have periods of remission. Numerous questions on cross-examination somewhat qualified the opinions of Drs. Jaquith and Head. They were of the opinion that Musgrove was mentally ill for the past thirty years and would be medically considered a schizophrenic person. Both doctors stated that schizophrenia usually starts in the middle thirties of a person's life but sometimes later, and Dr. Head conceded that his illness could have occurred since September 1957 but that would be highly unlikely.

Defendant offered more than a dozen witnesses, all but one or two having no interest in the lawsuit, who

testified concerning the activities of Musgrove's life, especially the period from 1938 until the time he had a breakdown and was taken to Whitfield on March 17, 1961. Musgrove lived on the forty acres of land involved in this suit in the log cabin already referred to from 1938 until it burned down or rotted down somewhere between 1951 and 1953. He then lived with his brother-in-law and sister, the Burnsides, near Ellisville for about five years and thereafter moved back to the Rustin Community and lived with Ben Williams, for whom he farmed and did other labor until the fall of 1960 when he built a small house on his 40 acres and moved into it so as to get homestead exemption on his land. In March 1961 he was taken to Whitfield as already stated.

These numerous witnesses for the defendant included a lawyer who had three to five visits with Musgrove in 1943, the deputy chancery clerk who took the acknowledgment on the lease to Boteler on September 25, 1957, the chancery clerk who had known Musgrove for many years and who talked to him concerning the lease to Boteler before it was executed, two timber dealers who had transactions with Musgrove over a period of time, a school teacher, a neighbor for whom Musgrove worked while he was living with the Burnsides near Ellisville, a preacher who lived for many years in the Rustin Community and for whom Musgrove made a crop for two years and worked from time to time, the person who made the purchase of one-half minerals for Texaco in 1942, and other immediate neighbors in the Rustin Community who had frequent contacts with Musgrove during the years he lived in that community and for most of whom he had worked, including Ben Williams with whom Musgrove lived for about two years and whose cane mill he operated for many years.

Defendant also offered the transcript of an interrogation of Musgrove by the attorney for the Welfare De-

partment on October 5, 1959, and various and sundry documents showing transactions Musgrove participated in over the years. From all of these witnesses whose testimony was not rebutted and stands without dispute it conclusively appears that from 1938 until March 1961, although he was given food and clothing by members of his family from time to time at infrequent intervals, Musgrove worked practically the entire time; paid the taxes on his land; obtained homestead exemption thereon; either farmed for himself or his neighbors; cleared a part of his 40 acres of land and fenced it; and conducted himself in the Rustin Community so that he was universally accepted by his neighbors and regarded as a good neighbor and competent to transact business.

There is no showing that Musgrove ever consulted a physician during his entire life up until he was committed to Whitfield in 1961. There is no showing that he ever had an argument with any of his neighbors or that anyone was ever able to take advantage of him in any transactions concerning land, the sale of timber, the leasing of land for oil and gas, or the sale of minerals. The record shows that he had numerous transactions involving real estate. There is no showing whatever that the mineral deed to Texaco was not for an adequate consideration. It is undisputed that at the time Musgrove leased his undivided one-half minerals under his 40 acres of land that the going rate which most of his neighbors received was $15 per acre for a ten-year lease, and Musgrove and his close friend, Ben Williams, received $25 per acre for a five-year lease.

Three or four of the witnesses testified that before Musgrove made the lease to Boteler in 1957 he took the unexecuted lease to the late Chancellor Roy Noble and received his advice before taking the lease to the chancery clerk's office for execution. When Musgrove sold some timber in the early 1940's he put most of

the money in the bank in a savings account, and when he was applying for old age assistance in 1960 he had a balance in his savings account of $400. It is established without dispute that the people of the Rustin Community permitted children to be around Musgrove and admitted him to their homes from time to time, and he was generally accepted as a good neighbor and a hard worker.

The overall question in this case is whether Musgrove was mentally capable of understanding and appreciating the nature of his acts in executing the two instruments and their effect on him and his property. Lambert v. Powell, 199 Miss. 397, 24 So. 2d 773, 168 A.L.R. 964 (1946) ; see also Annot., 168 A.L.R. 969 (1946).

There was no proof offered on behalf of complainants concerning Musgrove's mental capacity as of the date of the execution of the two instruments. Therefore, the question arises whether the evidence in this case is sufficient to establish that Musgrove was completely and permanently insane prior to 1942. If he was, then such proof of complete and permanent insanity would raise a presumption that the same condition continued, and the burden of proof would be upon the defendants to show that at the time of the execution of the mineral deed in 1942 and the oil and gas lease in 1957 that condition had passed away and had been succeeded by lucid intervals. Parkinson v. Mills, 172 Miss. 784, 159 So. 651 (1935) ; Ricketts v. Jolliff, 62 Miss. 440 (1884) ; Smith v. Smith, 47 Miss. 211 (1872).

We are of the opinion that there is no competent testimony showing that Musgrove was completely and permanently insane at any time prior to March 1961 when the evidence shows that he had a sudden and dramatic mental breakdown and ''went crazy.'' There is no doubt but that Drs. Jaquith and Head are emminent psychiarists and their opinion is to be highly regarded. There is considerable question, however, whether their testimony reaching back to 1930, thirty years before they

ever saw Musgrove, would be sufficient to justify a finding of complete and permanent (or chronic and habitual) insanity even if their opinion had been based on all the facts. Their testimony has little probative value, however, because they based their opinions on the facts set forth in the complainants' hypothetical question alone, and they had not been furnished the facts established by the many witnesses for defendants, whose testimony is undisputed, concerning the manner in which Musgrove conducted himself and his activities over a period of many years while living in the Rustin Community and at Ellisville.

As already noted, counsel for defendants were unable to supplement complainants' hypothetical question with facts which they proposed to prove later, and which they did prove without dispute by numerous witnesses when the defendants put on their case. The result was that the opinions of Drs. Jaquith and Head were based on only part of the facts established by the proof. The value of an opinion of an expert witness, especially one whose opinion is based on the history going back many years, is no stronger than the facts upon which it is predicated. The unequivocal opinion of Dr. Floy Jack Moore, Chairman and Professor of the Department of Psychiatry at the University Medical Center, who did not examine Musgrove but who was asked a hypothetical question containing a summary of all of the facts established by the proof, including the facts concerning Musgrove's belief in ghosts, digging for gold, reference to John the Baptist, and non-existent Indians, and Dr. Moore stated that he would have no question of Musgrove's competency during the periods in question. One of the principal facts upon which Dr. Moore based his opinion of Musgrove's mental competency was the fact that Musgrove had been able to adjust to life and make a living wherever he lived, and that the people who knew him best did not regard him as abnormal and

trusted him with their children and their women and regarded him as a good neighbor.

■■ ■ Conceding Musgrove had intermittent or temporary periods of mental incapacity at various times in the past, that is not sufficient to raise a presumption that such condition continued to the date of the execution of the instruments involved. Lambert v. Powell, *supra.* In Young v. Martin, 239 Miss. 861, 125 So. 2d 734 (1961), we held that nervous breakdowns suffered in 1934, 1938, 1941 and 1942, and being treated at Whitfield each time, together with other proof was not sufficient to raise a presumption that such disability continued to the execution of the will in that case. The Court said: "Temporary or intermittent insanity or mental incapacity does not raise a presumption that such disability continued to the date of execution." 125 So. 2d at 738.

The question of presumption of continuing insanity has arisen in a number of our cases but in only two has this Court held that the presumption arose, and in both of those cases there had been a previous adjudication of insanity prior to the transactions under consideration. These cases are Ricketts v. Jolliff and Parkinson v. Mills, *supra.* Assuming as true all testimony offered by complainants, the cases of Lambert v. Powell, *supra,* and Fortenberry v. Herrington, 188 Miss. 735, 196 So. 232 (1940), and the other cases cited in this opinion, require a reversal of this case.

■■ ■ The defendants in the present case would be entitled to a judgment in this Court even if the presumption of complete and permanent insanity in the 1930's had been established. The undisputed proof shows that from about 1938 until just before Musgrove was admitted to Whitfield in 1961 he had a sustained and lengthy period of lucidity in which he manifestly understood the nature and effect of his business transactions to the same extent as any other person of his background and education would understand, and that

he was competent to understand the effect of his transactions on his property. Moreover, in addition to the general proof of competency about the time of the two transactions involved in this case, the defendants proved that on the day he executed the mineral deed in 1942 Musgrove was competent to transact business; and the proof regarding his competency in 1957 when he executed the lease to Boteler was established by a number of witnesses, all without dispute. This Court has held that the crucial time when evidence of mental capacity attains its maximum and controlling relevancy is at the time of the execution of the document in question. Ward v. Ward, 203 Miss. 32, 33 So. 2d 294 (1948).

■■ ■ It is our opinion that the testimony failed to raise the presumption of continuing insanity and that the defendants also established that at the times the two instruments were executed Musgrove was mentally competent to understand the nature and import of the transactions.

For the reasons stated, the decree of the lower court is reversed and judgment is rendered here dismissing the bill of complaint.

Reversed and rendered.

All Justices concur.